**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WICHITA TELEVISION CORPORATION, Incorporated, d/b/a KARD-TV, Respondent.**

**No. 6153.**

United States Court of Appeals Tenth Circuit.

April 5, 1960.

Rehearing Denied June 1, 1960.

Duane B. Beeson, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., and Standau E. Weinbrecht, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

George J. Bott, Washington, D. C., and Daniel M. Moyer, Wichita, Kan., for respondent.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The National Labor Relations Board has petitioned for a decree enforcing its order requiring respondent, Wichita Television Corporation, Inc., d/b/a KARD–TV, to offer reinstatement with back pay to employees found to have been either discharged in violation of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., or denied reemployment to which they were entitled under the Act; to cease and desist from discouraging union membership, interfering with, coercing or restraining its employees in the exercise of their rights under the Act; and to post appropriate notices.

The principal questions arise out of the contention that the record as a whole does not sustain either the finding that respondent was guilty of unfair practices in discharging two employees for union activities and coercing employees through interrogations and threats, or the conclusion that the striking employees who unconditionally requested reinstatement were entitled to be offered remployment even though replacements had been hired.

In May of 1956 Gordon Coker, a television director in the employ of respondent, began distributing union [1] membership cards to his fellow production department employees. Apparently this was the first outward display of union interest among this group. On May 10

---

1. The Union was known as "IATSE". The full name is International Alliance of Technical Stage Employees & Moving Picture Machine Operators of the U. S. & Canada, Motion Picture Projectionists, Local No. 414, AFL–CIO.

a large majority of these employees held a meeting at which they agreed to send respondent a letter containing their names and requesting that the Union be recognized as their chosen bargaining representative. The next day, shortly after receiving this letter, Coker and Frank Neal, another employee, were discharged. Neal was not actually working at the time. He had previously quit his employment but had been rehired and was to report for work at a later date but, on May 11 he was told he would not be allowed to do so.[2] Within a week both Coker and Neal formally requested reinstatement but their requests were ignored. On May 31 the production department employees met again and, in the presence of two Union representatives, discussed a plan of action. They decided to make one final request for a meeting with management to discuss recognition, grievances and bargaining, and then if that request were rejected, to strike. Pursuing this plan, some twenty employees struck on June 2 after their request for a meeting was ignored. Respondent immediately terminated the employment of the strikers by hiring replacements who were given permanent employment. When the strike ended and the strikers requested unconditional reinstatement on July 16, substantially all of their jobs had been filled and the reinstatement requests were not recognized.

On May 15 the Union filed formal charges protesting the alleged discriminatory discharges of Coker and Neal. On December 26, after it had become evident that none of the strikers was to be reinstated, the Union filed an amended charge protesting the respondent's denials of the several requests for reinstatement of the alleged unfair labor practice strikers.[3]

■■ The Board found that respondent interfered with its employees' rights by discharging Coker and Neal and by coercing employees through interrogations and threats. The Board did not consider all of the several instances of questioning and threats of which the Trial Examiner made findings in reaching his conclusion as to this second method of interference; rather, the Board expressly found only that there were a sufficient number of such instances to warrant the inference that respondent's union hostility was behind the discharges. But the Board's general adoption of the Examiner's findings supplies an adequate source for that portion of its order requiring respondent to cease interference by means unrelated to discrimination with regard to hire and tenure. It is clear that in finding interference by coercion and threats, the Trial Examiner and the Board relied principally on such of respondent's conduct as was directed at Coker and Neal before they were discharged. That conduct was covered by the charge filed on May 15. But the Trial Examiner and the Board also relied on several instances occurring both before and after May 15, involving employees other than Coker and Neal. Respondent contends that this was error because the two formal charges provided no notice that such instances of conduct would be made the subject of Board inquiry. The short answer to this contention is that respondent's conduct directed at Coker and Neal and included in the

2. The Board found that on May 6 Neal had approached Moyer and requested his old job back; that Moyer referred him to the production supervisor, Renek, who informed Neal that he was to return to work on the 13th. From these findings the Board concluded that Neal had been rehired and was an employee on the 11th, so that Renek's action amounted to a discharge as specified in the formal charge filed by the Board, and not, as respondent contends, a discriminatory refusal to rehire, which was not charged.

3. The complaint, based upon these charges, alleged that the respondent committed unfair labor practices by discharging Coker and Neal in violation of Section 8(a) (3) and (1) of the Act, by refusing to reinstate the unfair labor practice strikers upon their unconditional requests, also in violation of Section 8(a) (3) and (1), and by coercing and restraining the employees in the exercise of their Section 7 rights, in violation of Section 8(a) (1) of the Act.

May 15 charge warranted the Board in restraining future interference by coercion and threats. Moreover, the Board has considerable latitude in considering conduct not specifically charged which is subsequent and related to practices protested against in the formal charge. National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; N. L. R. B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243.

■ This brings us to a consideration of the two factual issues respecting, first, the real reason behind the Coker and Neal discharges and, second, the motivating cause or causes of the subsequent strike. Upon consideration of the record as a whole, we find adequate support for the Board's conclusions that Coker and Neal were discharged because of their union adherence or activities and that these discharges were an effective cause of the strike. Renek, the production supervisor, talked to Coker the day before his discharge, asking him if he knew of "this union business going on," and then saying: "If you hear anything, let me know because Mr. Moyer said we have to get rid of them." Later that same day Renek asked Frank Neal: "What do you know about this Union?", and told him "we have got to have names of people who are organizing, behind this." A sales manager telephoned Coker's home on May 10 and, after Coker had denied having any knowledge of the Union, explained to him that "It is a union that is trying to get in here and we have to stop them."

The record is replete with evidence which establishes respondent's determination to be rid of employees actively engaged in union organization. Other evidence shows that respondent believed Coker and Neal to be organizers and discharged them for that reason. Bob Edwards, the Chief Announcer in Charge, correctly surmised, while discussing the union situation with another announcer, that Coker was the "organizer" directly responsible for the union interest which that announcer professed to have. Neal, after being interrogated by Renek as related above, asked Moyer if management thought he was returning to work primarily to help organize the production employees, and Moyer answered: "It kind of looks that way." Within a very short time after the Union letter of May 11 was received, Coker was discharged and Neal was told he was not to report back to work on May 13.

■ The Board also concluded, reasonably we think, that the discharges were not actually prompted by the legitimate reasons which respondent suggests existed. The respondent's evidence was to the effect that the day before his discharge, Coker "told off" Renek by predicting that once the Union had successfully completed organizing, it would do the hiring and firing of employees and Renek's authority would be reduced to where he would have to be careful how he treated the employees; that management officials met the next morning at which time Renek related what Coker had said to him the previous day, whereupon the officials agreed that Coker would have to be discharged because in the future there could not possibly be adequate cooperation between him and Renek, his supervisor. It is apparent the Board considered that, even assuming Coker had made these statements to Renek, the more reasonable inference, in view of respondent's conduct after learning of the plan to organize the production department, was that Coker was discharged because of his union adherence and activities. Inferences to be drawn from the evidence are for the Board, not the Courts. The jurisdiction of courts of appeals is limited under the Act to a determination of the validity of the final order of the Board, and to the enforcement of that order. 29 U.S.C.A. § 160 (e); N. L. R. B. v. Hamilton, 10 Cir., 220 F.2d 492; cf. N. L. R. B. v. Cheney Cal. Lumber Co., 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739.

To explain its action with respect to Neal, respondent introduced evidence of Neal's May 6th request for reemployment and of a seemingly final agreement, reached two days later by Moyer and an-

584

other supervisor, to deny the request. However, respondent's evidence also shows no further steps were taken until the May 11th management meeting, which took place on the morning the first Union letter was received, when it was decided, after discussion, that Neal's habit of burdening supervisors with his personal problems required a denial of his request. We agree with the Board that the time lapse of several days between the making and denial of Neal's request, during which time it appeared he would be returning to work on May 13, is inconsistent with management's supposedly low esteem for Neal. These circumstances support the Board's conclusion that the real reason Neal was never allowed to return to work was respondent's belief that he was a union adherent and organizer. Cf. Phelps Dodge Corporation v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271.

■ Respondent attacks on two grounds the Board's finding that the discharges were the substantial cause of the strike. The first argument is that the Board's finding was erroneously predicated on its mistaken belief that the Trial Examiner had found the discharges to have been a substantial cause of the strike. While it is true the Trial Examiner found only that the discharges were in part responsible for the strike, the Board, in addition to adopting the Examiner's findings on this point, expressly found that the discharges were an "effective cause" of the strike. The Board was free to make its own independent factual determination as it did in this case. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Respondent also argues that the record as a whole discloses the strike was economic and called solely because of respondent's failure to bargain, and that the evidence did not justify the Board in finding the alleged unfair practices were a substantial cause. Several employees who attended the May 31st meeting testified how the decision to strike was made at that time. It is quite clear that the discharges of Coker and Neal were discussed at the meeting, and the evidence fairly supports the view that a majority of the employees in attendance agreed to strike if no immediate headway were made toward making arrangements to discuss with management the questions of bargaining and the discharges. Immediately after Coker and Neal were fired, the Union made efforts to secure their reinstatement and filed unfair labor charges on their behalf. There was evidence that the motions to strike, made at the May 31st meeting, included references to the discharges. One witness testified that at this meeting "There was a discussion amongst the individuals themselves, and the general consensus of opinion was that we feared very much for Mr. Neal and Mr. Coker after they had been fired as a result of union activities." When the strike did commence several days later, some of the picket signs protested the discharges of these two employees, and handbills distributed to the public contained like protests.

■ Striking employees are upon request entitled to reinstatement if unfair labor practices are the cause or one of the operative causes of their strike. Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309; Wheatland Electric Coop. v. N. L. R. B., 10 Cir., 208 F.2d 878, certiorari denied 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108; N. L. R. B. v. Barrett Co., 7 Cir., 135 F.2d 959; N. L. R. B. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, certiorari denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540. We conclude that the record, considered as a whole, establishes that there was a sufficiently close causal connection between the discharges and the strike to warrant the reinstatement of the strikers.

■ However, respondent resists enforcement of that remedy because of alleged misconduct by strikers. Several of respondent's officers observed strikers picketing more than two abreast in front of the KARD–TV station, carrying large, obtrusive umbrellas on the picket line,

standing in a recessed doorway to the station, heckling non-striking employees, and engaging in other similar activities. In addition there were several serious occurrences for which respondent sought to saddle the strikers with the blame, such as tire-slashings of automobiles belonging to non-striking employees, and the shifting of a large microwave unit from its proper telecasting position. Respondent contends it was justified in refusing to reinstate the strikers because it reasonably believed at least some of them were responsible for these serious occurrences. The strike having been caused by unfair labor practices, the strikers are entitled to reinstatement unless there was evidence of such misconduct of the strikers as to make that remedy inappropriate. It is clear that none of the misconduct attributed by the evidence to the identified strikers was of such a serious nature as to warrant denial of reemployment. These incidents fall far short of violence and are normal outgrowths of the intense feelings developed on picket lines. Cafeteria Employees Union, Local 302 v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58; N. L. R. B. v. Longview Furniture Co., 4 Cir., 206 F.2d 274. There was evidence of acts of a serious nature during the maintenance of the picket line, but there was no proof that any identified striker, or for that matter any unidentified striker, took part in such acts. The law is settled that an employee's disqualification for reinstatement must be based upon evidence that he personally participated in the misconduct. International Ladies' Garment Workers' Union, A. F. L. v. N. L. R. B., 99 U.S.App.D.C. 64, 237 F. 2d 545; N. L. R. B. v. Marshall Car Wheel & Foundry Co., 5 Cir., 218 F.2d 409; N. L. R. B. v. Crowley's Milk Co., 3 Cir., 208 F.2d 444; N. L. R. B. v. Deena Artware, Inc., 6 Cir., 198 F.2d 645; N. L. R. B. v. Wallick, 3 Cir., 198 F.2d 477, 485, note 10; N. L. R. B. v. Stackpole Carbon Co., supra.

Respondent also has advanced several miscellaneous grounds in opposition to enforcement. The first concerns the Board's failure to expressly rule on each of respondent's 144 special exceptions to the intermediate report. Title 5 U.S.C.A. § 1007(b) (Section 8(b) of the Administrative Procedure Act) requires an agency to rule on exceptions made to the recommended decisions of that agency's subordinate officers. This requirement can be satisfied, however, without specific, separate rulings on each exception. N. L. R. B. v. State Center Warehouse & Cold Storage Co., 9 Cir., 193 F.2d 156; N. L. R. B. v. Sharples Chemicals, Inc., 6 Cir., 209 F.2d 645. The Board's decision, including that part adopted from the Trial Examiner's report, sufficiently informed respondent of the disposition of all of its exceptions. Respondent also contends the Trial Examiner erred in denying its motion to take the deposition of Harry Renek, who had left the employ of KARD–TV in August of 1956, sometime between the filing of the first formal charge with the Board and the hearing before the Trial Examiner. Respondent's counsel conceded that the only efforts to locate Renek consisted of several telephone calls. At the beginning of the hearing the Trial Examiner agreed to issue a subpoena demanding Renek's appearance as a witness, but counsel persisted in his request to take a deposition and did not take advantage of the subpoena procedure until later in the hearing. Since Renek apparently was never located for the purpose of serving the subpoena, it is not shown that his deposition could have been secured. The motion was addressed to the sound discretion of the Trial Examiner and it has not been made to appear that the denial of the motion was clearly prejudicial. N. L. R. B. v. Gala-Mo Arts, Inc., 8 Cir., 232 F.2d 102. We find no merit in the contention that the Examiner was biased and prejudiced against respondent to such an extent as to invalidate the order. As to the several other contentions of respondent, they have been disposed of by what has heretofore been said or have been considered and found to be without merit.

The order will be enforced.