**MONTGOMERY WARD & CO., Incorporated, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 8567.**

United States Court of Appeals
Tenth Circuit.
March 22, 1967.

---

Narcisse A. Brown, Chicago, Ill., (William F. Schoeberlein, Denver, Colo., Richard C. Scheidt, Jack D. Brousard and J. Vernon Lloyd, Chicago, Ill., were with him on the brief) for petitioner.

Gary Green, Washington, D. C., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Joseph C. Thackery, Atty., N. L. R. B., were with him on the brief) for respondent.

Before LEWIS and ALDRICH *, Circuit Judges, and STANLEY, District Judge.

LEWIS, Circuit Judge.

Montgomery Ward & Company seeks review of an order of the National Labor Relations Board requiring Wards to offer a discharged employee reinstatement with back pay and to post customary notices. The subject order followed a determination that Wards had violated section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), by refusing the employee reemployment upon termination of an economic strike called against the Pueblo, Colorado Wards store by the Retail Clerks International Association, Retail Clerks Union Local 24, AFL-CIO, during the summer of 1964. The Board seeks enforcement of its order. No jurisdictional question is presented.

In its broad aspect this controversy in its appellate characterization might be described as one in which Wards asserts that its employee, Mrs. Schaffer, was discharged for cause and the Board asserts that such cause was insufficient to warrant forfeiture of statutory protections given to an employee engaged in lawful picketing during a lawful strike. Against the background of these generalizations, admittedly an

* Of the First Circuit, sitting by designation.

oversimplication of the appellate issue is whether "cause" or "insufficient cause" for discharge exists when a picketing employee calls a customer of a retail store a dirty bastard and a son-of-a-bitch. A determination of this issue would of course be dependent upon the particular circumstances surrounding the incident [1] and such circumstances would allow routine review of whether the Board has properly bounded its expertise in attempting to obtain the delicate balance between the rights of employer, employee, and the public under the National Labor Relations Act. But the findings of the trial examiner adopted by the Board lack specificity to such a degree as to practically defy judicial review. We summarize the circumstances of the incident as revealed by the record and the examiner's narration of his analysis of the evidence, but disregarding what we consider pure speculation in any attempt to reconstruct the pertinent event leading to the controversy.[2] In sum, the Board concludes that the evidence indicated a verbal exchange between Mrs. Schaffer and the customer, Mrs. Howell, two "irate and resolute women" whose language was strong, was first personalized by the customer, and was culminated by the employee's flow of abuse. The Board likens the word fest to a portrayal of the "normal outgrowths of the intense feelings developed on picket lines." NLRB v. Wichita Television Corp., 10 Cir., 277 F.2d 579, 585.

■ We have no hesitancy in accepting two basic legal principles advanced by the parties. First, we have no doubt that it is a managerial prerogative to discharge for cause an employee who, in the course of employment, addresses a customer of a store in the words we have set out. But we are dealing here with an alleged violation of section 8(a) (1), not section 10(c) of the Act, and consequently "[w]e are not in the realm of managerial prerogatives." NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 24, 85 S.Ct. 171, 173, 13 L.Ed. 2d 1. Managerial prerogatives are pertinent to our inquiry but not dispositive. Second, advancing from the statutory premise that picketing is a protected activity, we acknowlege that not every incident occurring on the picket line, though harmful to a totally innocent employer, justifies a refusal to reemploy a picketing employee for acts that exceed the bounds of routine picketing. Impulsive behavior on the picket line is to be expected especially when directed against non-striking employees or strike breakers. Absent violence, varying incidents have been held not to disqualify the picket from the protection of the Act. E. g., NLRB v. Wichita Television Corp., supra; NLRB v. Thor Power Tool Co., 7 Cir., 351 F.2d 584, 587; Republic Steel Corp. v. NLRB, 3 Cir., 107 F.2d 472, 479. But impulsive behavior was neither conceived nor baptized by the National Labor Relations Act, and it must be recognized that conduct falling directly in the midst of a labor dispute is distinguishable from conduct where intense feelings are directed against a member of the public. A casual person, herself not immune from human irritation, is entitled to a far higher degree of control upon the part of a picket than, for example, a non-striking employee. And although we give deference to the Board in its primary right to exercise

---

1. No extraneous circumstances are pertinent to the case. Mrs. Schaffer was lawfully picketing; the strike was a lawful economic strike; Wards did not discharge Mrs. Schaffer as an act intended to discourage union activity; Wards did not instigate the incident, participate in it in any way nor use it as a pretext for discharge. The incident was not one in a pattern, there being only one other occurrence leading to controversy. The Board found the other picket did not in fact do the acts of which she was accused. Wards has not sought review nor the Board sought enforcement on this aspect of the case.

2. The trial examiner's difficulty was understandable in view of the record. The testimony of almost every witness was vague, unresponsive and contradictory, leading to no clear picture of the incident.

its discretion and expertise in balancing rights under the Act under even the most sensitive of circumstances, we are constrained to hold that the Board has done no more than rationalize to reach a result both not supported by the evidence and not urged or contemplated by even the charging party.

We learn from NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1, that:

"In sum, § 8(a) (1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct."

Every witness presented by General Counsel who testified on the subject emphatically denied that Mrs. Schaffer, the picket, had called Mrs. Howell, the customer, a bastard or son-of-a-bitch. Mrs. Schaffer's own testimony was in pertinent part:

"Q. Directing your attention to this period of picketing last year, at any time during this picketing, did you have occasion to speak with a woman named Helen Howell? [No recorded answer.]

Q. When was this? A. This was on June the 5th.

Q. Now, if you remember, what did you say to her and she say to you, if anything? A. Well, we were at the side door, and she started to go in, and I asked her not to go in.

Trial Examiner: What did you say?

The Witness: As to the exact words, I said, you aren't going in there, are you? And she said, I most certainly am. And I said, well, we just came from the negotiations and they treated us like dogs, they ignored us, and then they started—I couldn't tell you everything she said. She said she could shop wherever she wanted to,

this was America, and so on, yak, yak, yak. And I just told her to shut up and get the hell in the store and to do her buying.

As to what she said, I can't tell you everything she said.

Trial Examiner: Approximately how long did this take?

The Witness: I couldn't say. It wasn't too long, sir."

\* \* \* \* \* \*

"Q. (By Mr. Phillips) Now, you said that Mrs. Howell was going in the store and you spoke to her. Now, what did you say to her? A. I asked her if she was going into the store. I said, 'You aren't going in there, are you?' And she said, yes.

Q. How did you ask her this? A. Just asked her. You mean was I mad?

Q. Well, yes. A. No, I was disgusted, because we had just come back from negotiations. I was real disgusted.

Q. Did you use any vulgar language in asking this question? A. No, I did not.

Q. Now, did Mrs. Howell speak to you? A. Yes, she did.

Q. What did she say? A. Well, as I say, she went on, I couldn't tell you all that she said. She said something about she didn't give a damn if we had bread on the table or not. Someone else, and I can't say for sure, said something about taking the bread off the table, and this was one thing she said, that this was America and she could shop where she wanted to, and such as this. And, as I say, she just went on in, and I told her to get the hell in there and do her buying and shut up.

Q. Now, when she spoke to you, did she just speak in a normal tone to you? A. No.

Q. How did she speak to you? A. She was mad.[3]

---

3. There is no doubt that Mrs. Howell eventually became mad. Upon entering the store she called the police, had Mrs. Schaffer arrested and charged with using

Q. Did you, at any time that you were talking to Mrs. Howell, use any vulgar language to her? A. No.

Q. Did you swear or curse at her at any time? A. I swore, I said, you get the hell in the store.

Q. Did you say anything else besides this? A. No."

\* \* \* \* \* \*

"Q. Mrs. Schaffer, the question was, is this what you told the Board agent, we all left the meeting quite angered at the attitude of the company? A. Yes.

Q. Also on your direct examination you stated that Mrs. Howell stated, I don't give a damn about the food on the table. Was this in response to the comment of your fellow picket? A. It must have been.

Q. About taking food off the table? A. Yes."

In contrast, Mrs. Howell testified:

"Q. Now, as you arrived at the curb line on the sidewalk there, will you describe to us what took place from that time on? A. Well, they were pretty close to the door when I went to go in, and they told me not to go in there. And I said, I don't belong to the union, and I can buy where I want to, just like that. And so she flew off the handle at me and—

Q. Who are you referring to? A. Mrs. Schaffer flew off the handle and raised her temper and called me a dirty bastard. And I said, well, I don't know who you are, but I said, I will find out. So I went on in the store, and before I went in the store there, just before I told her I'd find out who she was, she said, oh, you God damn son of a bitch. So I called for the assistant manager or the manager, either one that was around there

close, and asked him to come upstairs and see and tell me who this person was that cursed me, see. And he said, that's Mary Schaffer."

A third witness, a picket called by General Counsel, after stating that Mrs. Schaffer used no abusive language, testified in part:

"Q. Now, is it correct that Mrs. Schaffer was the first one to speak between she and Mrs. Howell: A. As far as I remember, she asked her not to cross the picket line.

Q. What did Mrs. Howell respond, if anything: A. Oh, something to the effect that she had traded in Montgomery Ward for years and the likes of her was not going to stop her, something like that. I can't remember the exact words.

Q. But you could hear clearly? A. I could hear them, but not real clear, because Mrs. Howell was standing more or less in the door of the store."

\* \* \* \* \* \*

"Q. Do you recall specifically that Mrs. Howell used the term 'Streetwalker?' A. Yes, I do.

Q. You are clear about that, there is no question that that was what she called Mrs. Schaffer? A. I am not real sure. She may have remarked, the likes of you, and something. I couldn't really remember exactly what she said. But as far as I remember, this is the word she used.

Q. What response did Mrs. Schaffer use to that? A. I really don't remember."

As we have earlier stated, there is a lack of specificity in the Board's findings flowing, perhaps, from the vagueness of the witnesses' testimony, and leading to an attempt by the Board to find a violation of section 8(a) (1) by what we consider to be indirect reason-

profane, obscene and offensive language. Mrs. Schaffer pleaded not guilty, was convicted and fined. Her appeal, which amounted to a statutory right to a trial de novo, resulted in a dismissal of the charges by the city attorney, with Mrs.

Howell's consent, because the matter was considered too trivial to pursue further. We cannot determine what, if any significance the Board placed upon these legal procedures. We place none.

ing not supported by the evidence. We note below the heart of the Board decision.[4] General Counsel's presentation of the case under the dictates of Burnup & Sims, supra, is defeated by the specific finding that Mrs. Schaffer did actually abuse the customer by misconduct which the examiner specifically finds to be "improper and not justified under the circumstances."[5] No witness testified that Mrs. Schaffer, through the actions or words of the customer, was provoked to use the words "bastard" and "son-of-a-bitch." All of General Counsel's witnesses testified the words were not used. And all such witnesses were discredited by the Board in this regard. Mrs. Howell, the customer, was found not to have used comparable language although her version of the incident was characterized as an oversimplification. And finally, we find a total insufficiency in the record to support the Board version that the customer first personalized the exchange of words. The phrase "likes of you," drawn from the vague testimony of an otherwise discredited witness, and the reference to "starving to death," similarly lifted from a discredited witness and said to have been, in Mrs. Schaffer's testimony, responsive to an earlier remark by a picket, cannot premise an original Board version of provocation.

■ The Board, agreeing that Ward's refusal to take Mrs. Schaffer back was not intended as discrimination against her for participating in the strike, is requiring it to replace behind its counters a saleswoman who substantially insulted a customer without cause. We hold that to forgive and forget the misconduct of the picket toward the customer as well as her testimony before the Board does not further the purposes of the National Labor Relations Act and is arbitrary.

The petition for review is granted and the order is set aside; the Board petition for enforcement is denied.

4. "Further reconstructing the event from the evidence, the Examiner's opinion is, as mentioned, that when Howell approached the picket line, Gianetta, and probably Schaffer, asked her in substance to please respect the picket line and not to go through it. The effort was to persuade a customer to withhold patronage from the picketed store. We believe that Howell proceeded through the picket line and had reached the door of the store when Schaffer said, 'You aren't going in there, are you?' and Howell said that she certainly was. Schaffer then proceeded, in a further effort to evoke sympathy and to persuade, to state that 'We just came from the negotiations [with the company] and they treated us like dogs, they ignored us. * * * *' It is possible that some mention was made about taking the bread from the table by going through the picket line, although this is uncertain. In any event, we believe that Howell, having been made the center of attention of not only the pickets but of some others, and resenting the situation, replied with asperity, in substance, that she did not belong to the Union and would buy where she pleased and that 'the likes of you' were not going to stop her and that she did not give a damn if you starve to death. Instinctively, under all the circumstances, the reference to 'the likes of you' was taken by Schaffer as a personalized attack upon herself with the implications that two irate and resolute women might well read into the remark or might intend by the remark. This was the first personalized type of reference that occurred in the fracas and it was followed by at least a type of semipersonalized remark, 'I don't give a damn if you starve to death.' This latter remark also additionally conveyed an attitude and expression of open hostility. In any event, we are of the opinion that Schaffer reacted strongly and called Howell a bastard or a dirty bastard. Howell, in substance, said that she was going to find out who Schaffer was and by implication indicated that she was not going to let the matter drop. We believe that Schaffer probably called Howell a s-o-b and told her in substance to go in the store and buy it out for all she cared. We are not persuaded that Howell made up her allegations of Schaffer's profanity although Howell's version of the details of the incident was, in our opinion, over-simplified. We do not believe that Howell used profanity, such as s-o-b and so forth in the course of the argument."

5. The trial examiner recommended that Mrs. Schaffer be penalized by 60 days' reduction in back pay. The Board did not follow this recommendation but did not reject the examiner's finding that Mrs. Schaffer's conduct was unjustified.