593 F.2d 972
 100 L.R.R.M. (BNA) 3035, 85 Lab.Cas. P 11,166
 HEAD DIVISION, AMF, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Midwest Regional Joint Board, Amalgamated Clothing and
Textile Workers Union, AFL-CIO, Intervenor.
 No. 77-1243.
 United States Court of Appeals,
Tenth Circuit.
 March 13, 1979.
 
 Thomas W. Budd, Clifton, Budd, Burke & DeMaria, New York City (Hutchinson, Black, Hill, Buchanan & Cook, Boulder, Colo., on brief), for petitioner Head Division, AMF, Inc.
 Bernard P. Jewler, Washington, D.C. (Robert G. Sewell and Howard F. Fine, Washington, D.C., on brief), for respondent N.L.R.B.
 Ronald M. Willis, Chicago, Ill., for intervenor Midwest Regional Joint Board, Amalgamated Clothing and Textile Workers Union, AFL-CIO.
 Before LEWIS, McKAY and LOGAN, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 This case involves a petition for review of a National Labor Relations Board (NLRB) order and the NLRB's cross-application for enforcement of that order.[1] That order adopted the NLRB Administrative Law Judge's disposition of the case except on one issue.[2]
 
 
 2
 We will grant enforcement of the NLRB's order only if its findings which gave rise to that order are supported by substantial evidence in the record as a whole. Plasticrafts, Inc. v. N.L.R.B., 586 F.2d 185, 187 (10th Cir. 1978); N.L.R.B. v. Beech Aircraft Corp., 483 F.2d 51, 55 (10th Cir. 1973).
 
 I.
 
 3
 The NLRB determined that petitioner, Head Division, AMF, Inc. (the Company), had violated Sections 8(a)(1) and (3) of the National Labor Relations Act (the Act).[3] The violations occurred at the Company's Boulder, Colorado, plant in 1975 during the Company's negotiation with the Midwest Regional Joint Board, Amalgamated Clothing Workers of America, AFL-CIO (the Union), which had won a representation election at the plant in August 1974. Three specific violations were found by the NLRB: the discharge of employee Mark Garber; the discharge of employee Robert Wright; and the Company's refusal to reinstate all strikers requesting reinstatement at the conclusion of an unfair labor practice strike staged at the Company's Boulder plant. We will review separately the NLRB's decision respecting each of these violations.
 
 II.
 
 4
 Employee Mark Garber was discharged on January 6, 1975. The Company attributed his dismissal solely to his having kicked and dented a soft drink vending machine, citing Company policy against deliberate destruction of property.[4] It was alleged before the NLRB that his dismissal was an unfair labor practice, because the vending machine incident was merely a pretext offered by management for Garber's dismissal and his active union support was the actual cause for his termination. The NLRB's Administrative Law Judge determined that "while Garber's discharge is not above suspicion, the totality of circumstances indicate that it was provoked purely and simply by his insensate and destructive attack on the pop machine." Record, vol. 4, at 1798.
 
 
 5
 The NLRB itself, however, declined to adopt the Administrative Law Judge's recommended order as it related to Garber, finding instead that the reason given for Garber's discharge was pretextual. It did so without disturbing the Judge's credibility findings and on the basis of the same evidence which was before the Judge. From that evidence, however, it drew a contrary conclusion. In reaching its conclusion the NLRB relied chiefly on evidence that banging and kicking vending machines at the plant was commonplace, yet Garber was the only employee ever discharged for such conduct, and on evidence that the three employees previously discharged for property destruction had committed far more serious acts than Garber, such as product sabotage and knife throwing. The NLRB concluded that the real reason for the discharge was Garber's union activity consisting of: distributing pamphlets for the Union; speaking favorably of the Union to his fellow workers; making complaints about health conditions and repeatedly attempting to procure from management a copy of a government report which management was unable to produce that concluded, according to management, that there was no danger of dust inhalation at the plant; and telling a supervisor, in discussing the Union and the Company's response to unionization, that he thought the Company felt threatened by the Union and had for this reason removed previously existing employee benefits.[5]
 
 
 6
 We are persuaded that the NLRB's decision was supported by substantial evidence and reasonable inferences drawn therefrom. We have indicated previously that the discharge of employees who are actively engaged in union affairs gives rise to an inference of impermissible, anti-union discrimination. E. g., N.L.R.B. v. Montgomery Ward & Co., 554 F.2d 996, 1002 (10th Cir. 1977); N.L.R.B. v. Glenn Berry Mfg., Inc., 422 F.2d 748, 751 (10th Cir. 1970). Anti-union discrimination need only be a partial motivation for the dismissal to find the dismissal unlawful. E. g., N.L.R.B. v. Montgomery Ward & Co., 554 F.2d at 1002. The employer's anti-union motive will, of necessity, generally be proven only by circumstantial evidence. Id.; Betts Baking Co. v. N.L.R.B., 380 F.2d 199, 204 (10th Cir. 1967).
 
 
 7
 In view of the fact that kicking and jostling the vending machine was a common practice among the employees, and that Garber was the only employee ever discharged for so doing without prior warning or attention to less extreme disciplinary sanctions the NLRB was not unreasonable in concluding that Garber was not discharged solely for kicking the vending machine. That conclusion is enhanced by the fact that while the Pepsi-Cola Bottling Company sent a serviceman to the plant following the incident, the record does not indicate repairs to the machine were necessary. The dent caused by Garber's kick, then, constituted a relatively minor infraction of the "no destruction of property" policy.
 
 
 8
 Nor is the inference of anti-union motivation dissipated by the fact that three prior instances of property damage characterized by the Company as the only prior violations of the policy resulted in termination of the employees involved. In one of those incidents the employee not only destroyed company property (punching three holes through plaster walls at the plant), but in addition made a false workmen's compensation claim. Both reasons were cited in support of his termination. In the second, an employee was terminated for sabotaging tennis rackets, rendering them scrap, and participating in an intentional work slowdown. Both reasons were given for the termination, which followed a written warning for absenteeism as well as a suspension for drinking on the Company premises. The notice of suspension contained a typed warning that it constituted "first and final written warning, that any future infractions of these company rules, by the employee will be cause for immediate termination." Record, vol. 3, at 1675. The third incident involved an employee who had previously been given a written warning concerning his behavior and who had threatened to sabotage tennis rackets. He was terminated for throwing several knives into the ceiling.
 
 
 9
 The record here, by contrast, indicates that Garber was given no warnings; no prior employment troubles were attributed to him; no other reason for termination co-existed with his denting the machine. The destruction in these earlier episodes was qualitatively worse than Garber's dent or resulted from action inherently more dangerous than Garber's kick. The NLRB could thus reasonably conclude that the termination of Garber was not just another instance of the Company's understandably harsh action against destroyers of company property and that the evidence offered by the Company did not dissipate the inference, arising from the evidence of Garber's extensive union activity, that his discharge was unlawful. Substantial evidence supports the NLRB's conclusion that Garber's discharge violated Sections 8(a)(3) and (1) of the Act and its order that he be reinstated with backpay is therefore granted enforcement.
 
 III.
 
 10
 Employee Robert Wright was discharged from the Company in May of 1975.[6] The "principal reason" given for his discharge was violation of the Company's rule against "circulation or distribution of written material in working areas or on working time." Record, vol. 4, at 1784. The NLRB, adopting the recommendation of its Administrative Law Judge, found that Wright's discharge violated Sections 8(a)(3) and (1) of the Act because the Company had applied its "no distribution" rule unevenly.
 
 
 11
 The evidence relied on by the NLRB indicated that on May 7, 1975, while contract negotiations between the Union and the Company were in process, the Company made a plantwide distribution of a document indicating that a major decrease in the worldwide ski market and losses suffered by the Company's Boulder operation could lead to closing the Boulder plant. The document implied that raises being sought by the Union would further jeopardize the plant's ability to remain open. On the following day, Wright brought to the attention of several workers in his immediate area, three employees within a hundred feet of his work station, and a single mailroom employee, an article from the April 17, 1975, issue of Business Week magazine. The article stated that "the ski business is booming again" and quoted a ski company executive as saying "the industry looks healthy now." Record, vol. 3, at 1298. Wright pointed out to some of these employees the apparent conflict between the article and the document circulated by the Company. Wright's activity came to the attention of management, and he was discharged.
 
 
 12
 The NLRB noted that the Company had previously been found in violation of Section 8(a)(1) of the Act for disparate enforcement of its "no distribution" rule. See Midwest Regional Joint Board v. N.L.R.B., 183 U.S.App.D.C. 413, 425, 564 F.2d 434, 446 (1977) ("The Company countenanced the distribution of pro-Company literature by lead personnel in the plant during working hours, while strictly enforcing the rule with respect to the distribution of pro-Union literature.") The NLRB found that the document distributed on May 7, 1975, was distributed by supervisory employees of the Company during work time and at employee work stations. No disciplinary action was taken against the supervisors. In January of 1975, Andrew McSherry, a leadman, distributed copies of an "open letter" penned by the Company's director of employee relations. McSherry distributed the copies, at least in part, during work time at employee work stations. McSherry was not disciplined for undertaking this distribution. Indeed, he had been asked by a supervisor to engage in this activity. McSherry had distributed literature from time to time at this same supervisor's request, sometimes with explicit instruction that the distribution occur during work time. No disciplinary action ever followed. While certain evidence in the record conflicts with these findings of the NLRB,[7] our review of the record convinces us they are supported by substantial evidence in the record as a whole.
 
 
 13
 The Company nonetheless argues that even if we agree that there is an adequate evidentiary basis for the NLRB's factual conclusions concerning Wright's discharge, we must nonetheless decline to enforce the NLRB's order, as a company may lawfully violate its own policy against distribution and at the same time enforce that policy against its employees.[8]
 
 
 14
 In support of its position, the Company cites N.L.R.B. v. United Steelworkers of America, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). In that decision the Court considered two cases. In one case the company had distributed, through its supervisory personnel, non-coercive anti-union literature. At the same time, the company indicated it would strictly enforce its rule against employees distributing literature on company property or on company time regardless of the pro- or anti-union sentiments of the employees involved. The NLRB dismissed the union's charge that the company's action constituted discriminatory enforcement of its "no distribution" rule. In the other case a company discharged three employees for violation of its "no solicitation" rule. During this same period, supervisory personnel solicited employees to withdraw their membership cards from the union. The NLRB found that the employees' discharge constituted unlawful discrimination. In each case the NLRB was "reversed" by a circuit court of appeals. Id. at 359-61, 78 S.Ct. 1268.
 
 
 15
 The "very narrow and almost abstract question" which the Court deemed before it in Steelworkers was whether "when the employer himself engages in anti-union solicitation (or distribution) that if engaged in by employees would constitute a violation of the rule . . . his enforcement of an otherwise valid no-solicitation (or -distribution) rule against the employees is itself an unfair labor practice." Id. at 362, 78 S.Ct. at 1271. The Court declined to rule that "the coincidence of these circumstances necessarily violates the Act," stating that "such a rule of law would show indifference to the responsibilities imposed by the Act primarily on the Board to appraise carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases and in light of the Board's special understanding of these industrial situations." Id. at 362-63, 78 S.Ct. at 1271.
 
 
 16
 The Company acknowledges that under Steelworkers a rule against employee distribution is discriminatorily applied when it is enforced against some employees but not others. However, it argues that when such a rule is consistently enforced against all employees, there is no unlawful discrimination even if the employer engages in distribution which is prohibited to the employees. Although we do not read Steelworkers exactly this way,[9] we are satisfied that even utilizing the Company's interpretation of that case, the NLRB's order is entitled to enforcement. Without expressly so stating, Steelworkers equated distribution or solicitation by the company with distribution or solicitation by supervisory personnel. See 357 U.S. at 360, 78 S.Ct. 1268. Thus, evidence that supervisory personnel distributed anti-Union or other material in contravention of the Company's policy with impunity does not of itself support a finding that Wright's discharge constituted unlawful discrimination. However, evidence that other nonsupervisory employees had transgressed that policy without incurring disciplinary sanctions would support the finding of discrimination against Wright.
 
 
 17
 The distributions by employee McSherry are in this latter category. Although the Company urges that McSherry, as a leadman, was an "agent" of the Company and that "distributions by him are within the permissible bounds set out in" Steelworkers,[10] we are not persuaded. It was stipulated at the hearing before the Administrative Law Judge that McSherry was a member of the bargaining unit and not a supervisor.[11] McSherry's characterization of his duties would not appear to place him within the Act's definition of "supervisor." See Record, vol. 1, at 268, and 29 U.S.C. § 152(11) (1970). In considering the earlier charge of discriminatory enforcement of the "no distribution" rule, the D.C. Circuit apparently concluded that distributions by lead personnel were distributions by "employees" rather than "supervisors." See 183 U.S.App. at 425, 564 F.2d at 446.
 
 
 18
 In addition, although the Company disparages reliance by the NLRB on the prior proceeding involving these same parties, the NLRB properly could consider the earlier instances of discriminatory enforcement of the rule. Such instances had occurred as recently as six to nine months before the Wright incident. See Head Ski Division, AMF, Inc., 222 NLRB 161, 165 (1976). It does not appear that during the period between the earlier instances of discriminatory enforcement and the Wright incident that the Company had taken any affirmative steps to disavow its unlawfully discriminatory enforcement of the rule.[12] Given both the proximity in time of the earlier incidents and the employer's lack of steps to cure its proven course of disparate enforcement, the NLRB properly could infer that Wright's discharge was an additional instance of discriminatory enforcement rather than solely motivated by legitimate (or at least non-discriminatory) concerns.
 
 
 19
 We hold that substantial evidence supports the NLRB's order that Wright be reinstated with backpay, and grant it enforcement.
 
 IV.
 
 20
 It is settled that unfair labor practice strikers are entitled to reinstatement whether or not replacements for them have been hired. Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N.L.R.B. v. Johnson Sheet Metal, Inc., 442 F.2d 1056, 1061 (10th Cir. 1971). It is also settled that a strike is an unfair labor practices strike even though there may have been causes for it in addition to the employer's unfair labor practices. Larand Leisurelies, Inc. v. N.L.R.B., 523 F.2d 814, 820 (6th Cir. 1975); N.L.R.B. v. Fitzgerald Mills Corp., 313 F.2d 260, 269 (2d Cir.), Cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). This court has expressed this principle in terms of whether "unfair labor practices are the cause or one of the operative causes" of the strike. N.L.R.B. v. Wichita Television Corp., 277 F.2d 579, 584 (10th Cir.), Cert. denied, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93 (1960).
 
 
 21
 The NLRB determined that the Union's strike against the Company, which began on May 9, 1975, was an unfair labor practices strike. The unfair labor practices, which the NLRB deemed to have been an operative cause of the strike in the instant case, consisted of several acts upheld as unlawful in Midwest Regional Joint Board v. N.L.R.B., 183 U.S.App.D.C. 413, 564 F.2d 434 (1977). These acts occurred during the Union's 1974 organizational campaign and subsequent to its prevailing in the representation election held that August. The unlawful activity included interrogating employees about their union activities, polling employees in an attempt to ascertain their union sympathies, threatening reprisals for union activities, discriminatory enforcement of a "no solicitation/no distribution" rule, and eliminating or restricting employee benefits (Saturday use of the company WATS line, a ski lending program, and a job posting procedure) in response to the Union's victory, all in violation of Section 8(a)(1) of the Act. 183 U.S.App.D.C. at 417, 425, 564 F.2d at 438, 446. In addition, the discharge of employee Barbara Vachon was there held violative of Section 8(a)(3)'s prohibition against discouraging union membership through discrimination in regard to terms and conditions of employment.[13] Id., 183 U.S.App.D.C. at 421, 564 F.2d at 442. Finally, we have approved above the NLRB's conclusion that termination of two additional employees, Robert Wright and Mark Garber, were unfair labor practices. Findings of the NLRB indicate that these incidents were among those which constituted an operative cause of the strike.
 
 
 22
 The Company contends that there is not substantial evidence in the record as a whole to support the NLRB's determination that there was a causal connection between the unfair labor practices and the strike. The Company's argument in this regard is twofold. First, the Company contends that the record taken as a whole conclusively demonstrates that the Sole cause for the strike was the failure of the parties to agree on a labor contract and that the NLRB's contrary conclusion is necessarily not based on substantial evidence. Second, the Company argues that even if some evidence appears to support the NLRB's conclusion, it is not substantial evidence.
 
 
 23
 In support of its first contention, the Company points to a union meeting notice, negotiation reports to Union members, an article in the Union's newspaper, and forms submitted by Union members to the negotiating committee and indicating individual views on bargaining priorities, all of which it is claimed indicate the strike related only to contract negotiations. Additionally, the Company points out that the strike immediately followed the Union's rejection of the Company's final economic proposals, at which time the parties were far apart on virtually every major contract issue. Assorted testimony is cited which indicates the negotiating committee decided to pressure the Company into making contract concessions by calling a strike or which otherwise is said to demonstrate the purely economic objectives of the strike. Of greatest claimed significance is the testimony of Richard Bensinger, a negotiating committee member, and Richard Rothstein, of the Union's national staff, to the effect that there would have been no strike had the Union and the Company settled their negotiating differences and entered into a contract. The Company argues that taken as a whole, the record establishes that the sole operative cause of the strike was the contract dispute and that it follows that unfair labor practices were not an operative cause of the strike.
 
 
 24
 It may well be that the evidence cited by the Company would support a finding that the strike was not an unfair labor practices strike. But that is not the question before us. The question we must answer is whether substantial evidence supports the NLRB's finding that the strike Was an unfair labor practices strike.
 
 
 25
 The NLRB acknowledged that a major cause of the strike was displeasure with the course of contract negotiations. However, it also deemed employee concern over the previously outlined unfair labor practices to have been a cause of the strike. In reaching this conclusion, the NLRB relied on: evidence indicating that some employees had considered striking to protest the earlier unfair practices as early as August 1974, but were talked out of it by Mr. Rothstein of the Union's national staff;[14] evidence of dissatisfaction with the national staff's failure to make those practices a subject of negotiation;[15] evidence that those practices figured prominently in discussions at Union meetings in April where the issue of whether to strike was raised;[16] evidence that several of the practices were raised at subsequent meetings immediately preceding the strike; a leaflet in the record containing the Company's unfair labor practices in a list of things which "prompted" the strike; evidence that certain signs utilized during the strike referred to unfair labor practices; a May 26 vote to stay on strike until employees[17] who had been unfairly discharged were reinstated; and evidence of employee rejection in August of a settlement with the Company which was perceived as abandoning the unfair practices issue, contemporaneously characterized by one employee as "one of the main reasons" for the strike. The NLRB acknowledged that the Union had not articulated concern with the unfair labor practices to management during negotiation. However, the NLRB discounted the significance of this fact, finding that it had been a deliberate tactical move on the part of the Union (and at odds with the wishes of the employees) in the interest of increasing the chances of successful contract negotiation.[18]
 
 
 26
 The evidence is clearly conflicting. We are satisfied that the NLRB's resolution of the conflict should not be disturbed because its conclusion that the unfair labor practices were an operative cause of the strike is based on substantial evidence, as outlined above.[19]
 
 
 27
 We have examined all of the Company's particularized challenges to the NLRB's individual findings and conclusions, intended to demonstrate that the evidence relied on by the NLRB is not substantial, and find them unpersuasive.[20] The NLRB's order that the strikers are entitled to reinstatement as unfair labor practice strikers is granted enforcement.
 
 V.
 
 28
 Having concluded that the findings of the NLRB are supported by substantial evidence in the record as a whole and that its order is consistent with applicable legal principles, the NLRB order before us is granted enforcement in its entirety.
 
 
 
 [1]
 228 NLRB No. 180 (1977)
 The labor dispute out of which the instant order arose has received this court's attention previously. In AMF Head Div. of AMF, Inc. v. N.L.R.B., 564 F.2d 374 (10th Cir. 1977), we determined that certain information in the possession of the NLRB would remain exempt from disclosure to petitioner under the Freedom of Information Act for so long as "the present unfair labor practice proceeding continues to be an active contest." 564 F.2d at 376. The substantive questions before us in the instant case were not involved in the earlier appeal.
 In addition, the D.C. Circuit reviewed another order of the NLRB growing out of this same general labor dispute in Midwest Regional Joint Bd. v. N.L.R.B., 183 U.S.App.D.C. 413, 564 F.2d 434 (1977). The aspects of the dispute under consideration there are not directly before us. However, the decision has some relevance to the instant case, as noted in our opinion.
 
 
 [2]
 The Administrative Law Judge found employee Garber's discharge lawful. The NLRB itself found to the contrary after reviewing the record
 
 
 [3]
 Sections 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3) (1976), provide:
 (a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 . . .o i
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .
 Section 157 provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities. . . .
 
 
 [4]
 The vending machine was not the Company's property; it belonged to the Pepsi-Cola Bottling Company
 
 
 [5]
 Removal of certain employee benefits was found to be an unfair labor practice. Midwest Regional Joint Bd. v. N.L.R.B., 183 U.S.App.D.C. 424-25 564 F.2d 434, 445-46 (1977)
 The NLRB, like its Administrative Law Judge, did not focus on why, in any event, destruction of property belonging to Pepsi-Cola Bottling Company would violate the policy set forth in the Company's "Employee Handbook" against "deliberate damage or sabotage of Company property." Record, vol. 1, at 113-14 (emphasis added).
 
 
 [6]
 The Administrative Law Judge determined that Wright's discharge became a "jural reality" on May 9, when his ID card was asked for. Record, vol. 4, at 1798. Such a step accompanies termination, according to the Company's president. A hearing was held on May 14, at which time Wright was formally notified of his termination. The Administrative Law Judge deemed this hearing "little more than hollow ritual, the decision having been made and at least partially implemented on the 9th." Id. On May 8, Wright was given to understand serious disciplinary action, either suspension or termination, would be forthcoming. Id. at 1785
 
 
 [7]
 In resolving these evidentiary conflicts, and choosing which evidence was entitled to greater weight, the Administrative Law Judge credited some witnesses and discredited others. With only the bare transcript before us, we are not in a position to make independent credibility determinations. See N.L.R.B. v. Montgomery Ward & Co., 554 F.2d 996, 999 (10th Cir. 1977); N.L.R.B. v. Central Mach. & Tool Co., 429 F.2d 1127, 1129 (10th Cir. 1970), Cert. denied, 401 U.S. 909, 91 S.Ct. 870, 27 L.Ed.2d 807 (1971)
 
 
 [8]
 This assumes that the "no distribution" rule is itself valid. The validity of the Company's rule, as written, has not been challenged; the NLRB in the instant proceeding found unlawful only its discriminatory enforcement. But see Head Ski Division, AMF, Inc., 222 NLRB 161, 161 n.1 (1976)
 
 
 [9]
 The Steelworkers case does not hold that an employer is in all circumstances free to engage in distribution which is prohibited to its employees so long as it enforces against its employees equally the "no distribution" rule. Rather, it simply states that such distribution by the employer does not Automatically mean that such strict enforcement of the prohibition against employees constitutes an unfair labor practice. See Gem International, Inc. v. N.L.R.B., 321 F.2d 626, 631 (8th Cir. 1963); 57 Mich.L.Rev. 615, 617 (1959)
 
 
 [10]
 Appellant's Brief at 51 n.23
 
 
 [11]
 The fact that McSherry made his distribution at the request of a supervisor does not convert McSherry into a supervisor; it does, however, serve to demonstrate that management was aware of employee infractions of its policy other than the one committed by Wright
 
 
 [12]
 Pursuant to the order in the earlier proceeding, the Company was required to post a notice which included the statement that the Company would not enforce its solicitation/distribution rule in an unlawful manner. See Head Ski Division, AMF, Inc., 222 NLRB 161, 161 (1976), Enforced in relevant part, Midwest Regional Joint Bd. v. N.L.R.B., 183 U.S.App.D.C. 413, 426, 564 F.2d 434, 447 (1977). This notice, however, was not ordered posted until long after the Wright incident. See 222 NLRB at 161
 
 
 [13]
 The termination of another employee, Richard Mahoney was also deemed by the NLRB one of the unfair labor practices which constituted an operative cause of the strike. However, it has since been held that substantial evidence did not support the conclusion that Mahoney's discharge was an unfair labor practice. 183 U.S.App.D.C. at 419-20, 564 F.2d at 440-41
 
 
 [14]
 The Company challenges as unsupported the NLRB's conclusion that some employees considered striking over the earlier unfair labor practices as early as August of 1974, citing certain testimony. However, other testimony fully supports that finding:
 But there was a period of particular concern that occurred after the election and prior to the beginning of the collective bargaining process, at which time and some of which occurred before, too at which time certain benefits, Mr. Rothstein advised me, were taken away from the people.
 As the result of their benefits being taken away from the people, the people had contacted him and said that they wanted to strike the Company. Particularly, the Company had eliminated the people's WATS line, the direct calling line. When that occurred, Mr. Rothstein called me and told me that the people wanted to stop work as a result of that.
 Record, vol. 2, at 779.
 Although it is not expressly stated that this discussion occurred in August, the election occurred on August 16, 1974, and it is settled that employee WATS line privileges were terminated "(i)mmediately following the election." Midwest Regional Joint Bd. v. N.L.R.B., 183 U.S.App.D.C. 413, 424, 564 F.2d 434, 445 (1977).
 
 
 [15]
 The Company characterizes as of no consequence this finding of the NLRB. It is argued that of the six discharges possibly of concern when an employee member of the negotiating committee complained to a Union staff member of the failure to raise them in negotiation, unfair labor practice charges relating to five of those discharges were subsequently dropped or dismissed. It is enough to note, however, that the employee's complaints related not only to failure to raise employee discharges, but also to failure to raise the termination of employee benefits, which termination constituted an unfair labor practice
 
 
 [16]
 According to credited and corroborated testimony, at the April meeting where the strike was first authorized, Rothstein made clear the relationship between the unfair labor practices and the forthcoming strike:
 (I)f we took a strike authorization vote and if the strike authorization vote passed, people should very clearly understand that we were taking a strike vote to strike about a whole course of Company conduct, and not over simply particular contract clauses which we hadn't even received yet; that that conduct included illegal action, such as the firing of Barb Vachon . . . and (Mark) Garber, as well as others, and the illegal withdrawal of benefits. And that in such a situation, it was our position that the strike would be a protected strike, an unfair labor practice, and in such a strike the Company could not hire permanent replacements for the strikers.
 Record, vol. 1, at 390.
 
 
 [17]
 Specifically mentioned was employee Vachon, whose discharge was found to be an unfair labor practice. Midwest Regional Joint Bd. v. N.L.R.B., 183 U.S.App.D.C. 413, 421, 564 F.2d 434, 442 (1977)
 
 
 [18]
 Mr. Loevy of the Union's national staff testified:
 My goal was to try to get a contract with the Company. I felt that if all the unfair labor practices were discussed, it would make it extremely difficult to get a contract.
 Record, vol. 4, at 1788. In determining whether a strike is an unfair labor practices strike, the NLRB is not limited to a consideration of what the Union stated at negotiation sessions or in public. The perspective of the striking employees may properly be deemed of controlling significance. See, e. g., N.L.R.B. v. Wichita Television Corp., 277 F.2d 579, 584 (10th Cir.), Cert. denied, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93 (1960); N.L.R.B. v. West Coast Casket Co., 205 F.2d 902, 907 (9th Cir. 1953).
 
 
 [19]
 The Company argues that the record demonstrates conclusively that the strike in question would have occurred even had the unfair labor practices never taken place. This being the case, the Company contends, the unfair labor practices were not, as a matter of law, an Operative cause of the strike
 In support of its position, the Company cites several cases including N.L.R.B. v. Wooster Div. of Borg-Warner Corp., 236 F.2d 898 (6th Cir. 1956), Rev'd in part, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), for the proposition that if the employer who the Company acknowledges has the burden of proof on this point demonstrates that a strike would have occurred even absent unfair labor practices, then there is insufficient causal connection to support a finding that a strike is an unfair labor practices strike. Exclusive adherence to a "but for" test as the only method of analyzing causation would likely prove as unsatisfactory in the labor field as it has in the torts field, where the "but for" test has been supplemented by doctrines such as the "substantial factor" test, for analyzing the issue of causation in complex cases where multiple causal factors are present.
 In any event, we are unable to say that the record as a whole compels the conclusion that the Company has conclusively shown that the strike would have happened when it happened, whether or not the unfair labor practices present in this case had occurred.
 
 
 [20]
 Several of the Company's objections in this category were treated above. See notes 14-18. Others relate to credibility matters: the testimony of some witnesses is challenged on the ground the witnesses were "interested"; other testimony is criticized as hearsay or paraphrase; evidence is stated as being capable of inferences other than those drawn. We are not in a position to sit as a trier of fact in this case, reweighing the evidence and making credibility determinations of our own, nor is it our function to search for possible inferences contrary to those drawn by the NLRB from a particular fact. N.L.R.B. v. Montgomery Ward & Co., 554 F.2d 996, 999 (10th Cir. 1977); N.L.R.B. v. Central Mach. & Tool Co., 429 F.2d 1127, 1129 (10th Cir. 1970), Cert. denied, 401 U.S. 909, 91 S.Ct. 870, 27 L.Ed.2d 807 (1971). That an inference other than the one drawn by an agency might also be drawn from a particular fact or set of facts does not mean the agency's conclusion is not supported by substantial evidence. Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)