**YMCA OF THE PIKES PEAK REGION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 88–2963.

United States Court of Appeals, Tenth Circuit.

Sept. 26, 1990.

Raymond M. Deeny (N. Dawn Webber, with him on the brief), of Sherman & Howard, Colorado Springs, Colo., for petitioner.

Fred L. Cornnell (Peter Winkler, Supervisory Atty., Joseph E. Desio, Acting Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, with him on the brief), N.L.R.B., Washington, D.C., for respondent.

Before SEYMOUR and BALDOCK, Circuit Judges, and SEAY,* District Judge.

SEYMOUR, Circuit Judge.

Petitioner YMCA of the Pikes Peak Region, Inc., challenges a National Labor Relations Board order adopting the Administrative Law Judge's ruling that the YMCA violated sections 8(a)(1), (3), and (4) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (4) (1988). The Board filed a cross-application for enforcement of the order. We have reviewed the arguments of the YMCA, and we hold that enforcement of the Board order is warranted.

I.

The YMCA of the Pikes Peak Region is a nonprofit, charitable, membership organization with two branches in Colorado Springs, a Downtown Center and a Garden Ranch Center. These facilities offer swimming pools, exercise equipment, weight rooms, tanning beds, meeting areas, and locker rooms, some of which are equipped with saunas, whirlpools, color television, and free toiletries and towels. The YMCA provides a range of health, educational, and recreational programs for children, adults, and senior citizens, including swimming instruction, yoga, aerobics, karate, weight reduction, and smoking cessation programs. The two facilities have a membership of approximately ten thousand.

Each member of the YMCA receives a card which has a statement of purpose on the back reading in part: " 'The purpose of the Y ... is to establish and maintain a fellowship of individuals and families of all faiths, and ... build a Christian society through activities and services which con-

---

* The Honorable Frank H. Seay, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

tribute to spiritual, intellectual, physical and social growth.'" Rec., vol. I, at 52.

The YMCA's membership dues and program fees constitute its principal source of income. During calendar year 1986, its gross revenues were $2,674,500, of which $56,700 went to purchase supplies and materials directly from suppliers located outside the State of Colorado. *See* rec., vol. II, g.c. ex. 2. The YMCA of the Pikes Peak Region is affiliated with the YMCA of the U.S.A., to which the local YMCA pays a percentage of its income in exchange for use of the logo, an employee retirement fund, and a number of other services. Local YMCAs must follow the constitution of the national YMCA, but their national affiliation does not require that they honor memberships from locations outside Colorado.

The YMCA's Garden Ranch Center first hired Rita Ague in July, 1985, to work as a substitute on the aquatic staff. In September, she began working twenty hours a week on a regularly scheduled part-time basis. On October 6, during an informal meeting called by aquatic director Diane Sanford and consisting of the entire aquatic staff, Ague voiced concerns she and other employees held about pool safety, wage, and overtime pay problems. Ague suggested to those at the meeting that because of these concerns, the employees might want to consider bringing in a union, and she passed around an envelope for interested employees to sign. Ague and four other employees put down their names. Ague then contacted the Office and Professional Employees Union, Local No. 5.

The next day, Sanford and Fawn Kirkland, Ague's immediate supervisor, reported to Ray Weber, the Garden Ranch Center executive director, that Ague had circulated the sign-up sheet. On October 8, Weber approached Ague while she was working in the pool area and asked her to come into his office. With Sanford present, Weber expressed his concern that Ague had not come to him first with the problems she saw at the YMCA. According to Ague, Weber then asked her whether she had contacted the union, and when she said that she had, he asked her what specific person she had contacted. He also requested that Ague inform him of "any union activities that might be occurring, or would occur in the future." Rec., vol. I, at 88. At some point in the conversation, they discussed the termination of an employee, whom Ague believed was fired for his union activities, but whom Weber asserted had resigned voluntarily. Within a few weeks of Ague's conversation with Weber, YMCA employees and a union representative began to meet.

On October 14, Fawn Kirkland telephoned Ague to inform her that her hours "had been cut way back." *Id.* at 91. Kirkland told her that there had not been any problem with her work performance, but that Sanford had told Kirkland that Ague's "hours were being cut back radically and that Ray Weber wanted to get rid of the troublemaker." *Id.* at 92. Kirkland also told her that she had recently submitted her own resignation.

Ague confronted Sanford, who denied making the "troublemaker" comment. Ague informed her that she intended to contact the union regarding her hours change, and she did so. According to Ague, Sanford then told her that "she was still in the process of reshuffling [the schedule], and she would get back to [Ague]." *Id.* at 94. The union sent the YMCA a letter dated October 24 expressing its intent to organize the YMCA workers, and noting that any change in Ague's working conditions as a result of her organizing activities would violate section 8(a)(3) of the Act. *See* rec., vol. II, r. ex. 7. By the end of October, Ague's hours essentially had been restored.

On November 13 and 14, James Klever, the YMCA's president and chief executive officer, conducted mandatory meetings for all employees in order to discuss the current unionization efforts. At one point during a meeting at which Ague was present, Klever commented that "it took a hundred men to build a barn, but one jack-

ass to tear it down." Rec., vol. I, at 98.[1] When Klever opened up the meeting for general discussion, Ague stood up and explained that she was the "jackass" referred to because she was the person who had called the union. She then elaborated upon the reasons why she thought a union was necessary.

At a later meeting with Klever, Ague again stood up to explain why she favored unionization. She also stated her concern that "when employees had tried to organize ... they had been asked to resign." Id. at 102. According to Ague, Klever then told her that " '[i]f you knew what a limb you've climbed out onto, you'd have heart failure.' " Id. She replied, " 'I don't threaten easily,' " and Klever responded, " 'Neither do I.' " Id. at 102–03.

During this time, efforts to organize the employees continued. One of the union activists, Bernadette O'Bryan, had a conversation about unionization with co-employee Dennis Schwed on November 15 while both were working in the physical services area. O'Bryan testified that she had asked Schwed, who is mildly retarded and has emotional problems, what he thought of the meetings concerning union organization efforts. He told her he wanted to talk to a friend about unions. O'Bryan suggested he also might want to talk to YMCA employees, and then she mentioned she felt "really frustrated with the narrow-mindedness of the employees that have come to [her] over the years complaining about different policies at the Y and then not doing anything about it." Id. at 222.

About a week later, O'Bryan's supervisor, Jim Asleson, called O'Bryan into his office and handed her a letter. The letter was a warning to her that any similar discussion regarding union matters would result in her termination. Asleson told her that Schwed had been very upset after the conversation, and had claimed that O'Bryan had called him a coward. O'Bryan denied that she had referred to Schwed as a cow-

ard. She also testified that she had never been reprimanded in the past for conversations not related to work, nor had her co-workers ever been disciplined for solicitations relating to football tickets or restaurants, for example.

On December 19, the union filed an unfair labor practices charge with the Board. On February 14, 1986, the parties entered into a settlement agreement in which the YMCA promised not to threaten employees with a cut in hours or any other type of retaliation because of their union involvement. The YMCA also agreed not to forbid union solicitation where the YMCA did not forbid other types of solicitation, and to rescind and remove the warning letter from O'Bryan's personnel file. See rec., vol. II, r. ex. 10(a).

After the settlement agreement, the employees had further unionization meetings. Towards the end of February, just before Ague left on a vacation, a number of employees signed union authorization cards in Ague's presence. One of these employees was Wes Beal. When Ague returned from her vacation, she discovered that Beal had been fired on March 5 for sexual harassment of Marnie Duke, a sixteen year-old high school student who worked at the Garden Ranch Center as a lifeguard and an instructor. Ague tried to get more information about the firing from other employees, but was unable to learn very much; her co-workers told her that she should talk to Duke if she wanted to learn more.

Ague testified she initially called Beal, who told her that he was "in a state of shock," that "[h]e was extremely surprised at being fired," and that he did not feel he had done anything to warrant the sexual harassment charge. Rec., vol. I, at 117. Ague asked him whether he thought his firing could be the result of union activities, and Beal responded that he may have aroused the hostility of YMCA management by defending Ague at one of the November meetings with Klever. According to Ague, she then "asked [Beal] if he

---

1. Klever testified that he said "any jackass can tear down a barn, but it takes a craftsman to build one." Rec., vol. I, at 498.

felt that he wanted to pursue this matter [with the union], and he said yeah, he thought he did." *Id.* at 119.

Ague contacted the union representative, and agreed to give an affidavit on March 19 to an investigating Board agent. Shortly before she was scheduled to give the affidavit, Ague testified that she tried to discuss Beal's firing with Sanford, but Sanford told her she was too busy to talk to her. Ague stated that Sanford promised to get back to her later, but did not.

After unsuccessfully attempting to speak to Duke at the YMCA on March 18, Ague told Duke she would call her at home, and she did so on the morning of March 19. According to Ague, she began the conversation by emphasizing that she was opposed to sexual harassment, and then she asked " 'what in the devil did [Beal] do to you to cause you ... to file a [sexual harassment grievance].' " *Id.* at 124.[2] When Duke said she did not know, Ague was more specific and inquired whether Beal had touched her or asked her to go to bed with him. To each of these questions, Duke responded in the negative. Ague testified she then explained to Duke that she was calling because she had to give an affidavit that day and that she wanted to ascertain whether Beal had been fired for "the right reasons," or because of his union activities. Duke did not elaborate on the substance of the sexual harassment charge, but suggested that Ague call another employee who had problems with Beal. Immediately after the conversation, Duke told her mother that Ague had just telephoned, and her mother called Weber after Duke left for school to express her anger that Ague had called and upset her daughter. Later that day, Weber spoke to Duke, and she relayed the conversation to him, including the fact that Ague was about to give an affidavit.

The next morning Weber, with Sanford, called Ague into his office to question her about the previous day's telephone conversation with Duke. Ague verified that she had asked Duke certain questions, and she explained that she had been concerned that Beal was fired not for sexual harassment, but for his union activity. Ague also asked whether she could meet with Duke and Weber to discuss the charges. Weber told her that he would consider the matter and determine what action to take. Later that afternoon, Weber called Ague back into his office, where he told her she was being terminated for "gross interference in a sexual harassment complaint." *Id.* at 134.

The union filed an unfair labor practices charge with the Board in which it alleged that the YMCA had discriminated against Ague by firing her because of her union activity, had coerced and restrained Ague because of her union activity, and had unlawfully discriminated against O'Bryan by issuing her a letter of reprimand. The administrative law judge ruled that the YMCA had violated sections 8(a)(1), (3), and (4) of the Act. In so doing, the ALJ set aside the settlement agreement because it found that the YMCA engaged in post-settlement unfair labor practices. The Board affirmed the findings and conclusions of the ALJ and adopted the ALJ's order.

II.

■ The YMCA first argues that the YMCA's impact on interstate commerce was insufficient to warrant the Board's exercise of its jurisdiction. Board jurisdiction is of two types, statutory and discretionary. Statutory jurisdiction derives from section 10(a) of the Act, which grants the Board the power "to prevent any person from engaging in any unfair labor practice ... affecting commerce." 29 U.S.C. § 160(a) (1988). Because Congress has vested in the Board "the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (per curiam), the Board may exercise its broad statutory jurisdiction whenever "an em-

---

**2.** Duke's account differs somewhat: Duke testified that Ague ignored Duke's protestations that she had to leave to go to school, and demanded that Duke tell her "why the hell [Beal] was fired." Rec., vol. I, at 294. Duke also characterized Ague's questions as "demeaning" and "belittling," and she stated that she was very upset by the conversation.

ployer 'has more than a de minimis impact on the flow of interstate commerce.'" *NLRB v. Southeast Ass'n for Retarded Citizens, Inc.*, 666 F.2d 428, 430 (9th Cir. 1982) (citation omitted).

■ Although its statutory jurisdiction is quite broad and therefore is not challenged by the YMCA, the Board has limited its jurisdictional reach under its discretionary powers. The Board curtails its jurisdiction by adhering to self-imposed minimum jurisdictional guidelines based on dollar amounts, which enables the Board to distinguish between those enterprises essentially local in character and those with a pronounced impact on the flow of interstate commerce. *See* R. Gorman, *Labor Law* § 2 (1976). A business generally must meet one of two relevant dollar limitations before the Board will assert its jurisdiction. If a business is a retail enterprise, it ordinarily must have a gross annual business volume of $500,000 and must make substantial purchases from or sales to other states on a direct or indirect basis. The Board will generally assert jurisdiction over a non-retail establishment if the gross outflow or inflow of revenues across state lines is at least $50,000. *See NLRB v. Marsden*, 701 F.2d 238, 241 (2d Cir.1983). Of course, it is important to remember that "all of the above dollar standards are adopted and applied as a matter of the Board's discretion.... Thus, the Board has asserted jurisdiction regardless of whether its dollar standards have been satisfied where 'public policy requires the Board to exercise jurisdiction to the fullest extent.'" Gorman, *Labor Law* § 2, at 25 (citation omitted). Furthermore, "[i]n light of the broad discretion given to the Board in the exercise of its jurisdiction, courts should intervene only where there is obvious unjust discrimination." *Southeast Ass'n*, 666 F.2d at 431.

■ The YMCA raises several points in support of the argument that the Board inappropriately exercised its discretionary jurisdiction. First, the YMCA asserts that the ALJ incorrectly applied the retail standard to it. The basis for the YMCA's argument is not altogether clear. It empha-sizes its charitable character, and thus seems to equate retail with for-profit and non-retail with not-for-profit. As the ALJ correctly pointed out, however, it is the fact that the YMCA's "services are directly to ultimate consumers," rec., vol. III, doc. 1, at 5, that makes it a retail establishment. *See, e.g., Bussey–Williams Tire Co.*, 122 NLRB No. 137, 43 LRRM 1266 (1959). The YMCA's gross annual business volume and its purchases from other states satisfies this retail standard. Even if the YMCA is categorized as a non-retail establishment, the direct inflow of materials from outside of Colorado in 1986 was $56,700. This amount meets the Board's jurisdictional guidelines.

■ The YMCA also argues that the Board should have asserted jurisdiction only upon finding that the YMCA had a "significant" impact on interstate commerce. Citing *Ming Quong Children's Center*, 210 NLRB No. 125, 86 LRRM 1254 (1974), it contends that charitable organizations as a general rule do not have such an impact. This contention misstates the law. In *The Rhode Island Catholic Orphan Asylum (St. Aloysius Home)*, 224 NLRB No. 70, 92 LRRM 1355, 1357 (1976), the Board expressly did away with the *Ming Quong* rule:

"[W]e see no reason to establish separate standards for institutions that seek to accomplish the same end but differ only in whether they are charitable or non-charitable. The sole basis for declining or asserting jurisdiction over charitable organizations will now be identical with those which are not charitable."

That non-profit institutions should be analyzed for jurisdiction in a manner identical to that applied to their for-profit counterparts has been consistently reaffirmed. *See NLRB v. Lighthouse for the Blind*, 696 F.2d 399, 404 n. 21 (5th Cir.1983) ("'Congress appears to have agreed that nonprofit institutions "affect commerce" under modern economic conditions'") (quoting *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 681 n. 11, 100 S.Ct. 856, 862 n. 11, 63 L.Ed.2d 115 (1980)); *Long Stretch Youth Home, Inc.*, 280 NLRB No. 79, 122 LRRM

1272, 1275 (1986); *Conway R.R. YMCA,* 237 NLRB No. 178, 99 LRRM 1157, 1158 (1978) ("the Board for jurisdictional purposes no longer distinguishes between profit and nonprofit organizations"). Furthermore, it is irrelevant for jurisdictional purposes that an enterprise is wholly charitable in its *purpose,* as well as in its organizational structure.[3] *See The United Way of Howard County, Inc.,* 287 NLRB No. 98, 127 LRRM 1185 (1988) (nonprofit corporations engaged in activities solely for benevolent purposes cannot avoid the rule of *St. Aloysius Home* and the inclusion of such corporations within NLRB jurisdiction); *Conway R.R. YMCA,* 99 LRRM at 1158 (charitable or worthy purpose not basis for declining jurisdiction).

■ As with all organizations, charitable organizations must have a sufficient impact on interstate commerce for the Board to exercise its jurisdiction. *See United Way,* 127 LRRM at 1185. Because the YMCA has met the discretionary jurisdictional standards, *see Greater Boston YMCA,* 243 NLRB No. 70, 101 LRRM 1521 (1979), we conclude that the Board did not abuse its discretion in finding the YMCA's impact on interstate commerce to be "sufficient."[4]

### III.

The YMCA challenges the Board's finding of unfair labor practices based on both pre-settlement and post-settlement conduct. With regard to pre-settlement conduct, the YMCA contends that the settlement agreement entered into by the parties precludes what in effect is relitigation of that earlier conduct. Even if the Board properly set aside the settlement agreement, the YMCA argues that the evidence is insufficient to find it committed unfair labor practices by interrogating Ague and reprimanding O'Bryan. It likewise argues that the evidence of post-settlement conduct is insufficient to support a finding that the firing of Ague constituted an unfair labor practice.

### A.

■ As a preliminary matter, we note that a court reviewing a Board order "should grant enforcement if the Board correctly interpreted and applied the law and if its findings are supported by substantial evidence in the record, considered in its entirety." *Presbyterian/St. Luke's Medical Center v. NLRB,* 723 F.2d 1468, 1471 (10th Cir.1983); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488–91, 71 S.Ct. 456, 464–66, 95 L.Ed. 456 (1951); *Le'Mon v. NLRB,* 902 F.2d 810, 812–13 (10th Cir.1990); 29 U.S.C. § 160(e) (1988) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive"). Substantial evidence is defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Universal Camera,* 340 U.S. at 477, 71 S.Ct. at 459 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

### B.

■ A settlement agreement is binding on all parties to it, but it "will be set aside if its provisions are breached or if postsettlement unfair labor practices are committed." *Lawyers Coop. Publishing Co.,* 273 NLRB No. 31, 118 LRRM 1213, 1215 n. 4 (1984); *see also Soule Glass & Glazing Co. v. NLRB,* 652 F.2d 1055, 1109 (1st Cir.1981). If the settlement agreement

---

**3.** Although we need not decide whether the YMCA has a charitable purpose, we agree with the ALJ that the statement of purpose notwithstanding, the YMCA is in many ways indistinguishable from a for-profit health club. *See* rec., vol. III, doc. 1, at 6.

**4.** The YMCA makes one final argument. It contends that the Board's exercise of jurisdiction was inappropriate because the Board only adopted the ALJ's opinion and did not articulate its own reasons for assertion of jurisdiction. This argument has no merit. We have long held that the Board need not restate the ALJ's opinion in its entirety if the ALJ's findings sufficiently inform the parties of the disposition of the arguments made. *See The Artra Group, Inc. v. NLRB,* 730 F.2d 586, 590 (10th Cir.1984); *NLRB v. Wichita Television Corp.,* 277 F.2d 579, 585 (10th Cir.), *cert. denied,* 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93 (1960).

is set aside, the employer's pre-settlement conduct may be assessed for unfair labor practices. Moreover, in order to determine whether post-settlement conduct constitutes an unfair labor practice, "presettlement conduct may be considered as background evidence in determining the motive or object underlying a respondent's postsettlement conduct." *Lawyers Coop.*, 118 LRRM at 1215 n. 4; *see also NLRB v. Shurtenda Steaks, Inc.*, 397 F.2d 939, 945 (10th Cir.1968) (employer unfair labor conduct antedating settlement admissible to determine purpose and intent of post-settlement conduct); *Mason & Hanger–Silas Mason Co.*, 270 NLRB No. 71, 116 LRRM 1073, 1074–75 (1984) (employer conduct prior to settlement agreement relevant regarding lack of anti-union animus).

Because a finding of a post-settlement unfair labor practice or breach of a provision of the settlement agreement is necessary before the pre-settlement conduct can be re-examined, we turn first to the issue of Ague's discharge, which is the basis of her claim that the YMCA committed post-settlement unfair labor practices.

## C.

■ The ALJ found that the discharge of Ague constituted an unfair labor practice in violation of sections 8(a)(1), (3), and (4).[5] A violation of sections 8(a)(1) and (3) occurs where four factors are present. An employee must have been engaged in concerted activity, the employer must have known of the concerted nature of the activity, the concerted activity must be protected under the Act, and the employer's discrimination must have been motivated by the employee's protected concerted activity. *See Meyers Industr. (Meyers I)*, 268 NLRB 493, 115 LRRM 1025, 1029 (1984), *remanded on other grounds, Prill v. NLRB*, 755 F.2d 941 (D.C.Cir.1985), *cert. denied, Meyers Industr., Inc. v. Prill*, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985), *on remand*, 281 NLRB No. 118, 123 LRRM 1137 (1986), *aff'd, Prill v. NLRB*, 835 F.2d 1481 (D.C.Cir.1987), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988).

Section 7 of the Act, 29 U.S.C. § 157 (1988), guarantees that employees "have the right to self-organization, to form, join, or assist labor organizations, ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The ALJ, focusing on Ague's telephone call to Duke, found that call to be "concerted activity" within the meaning of section 7.[6]

■ The YMCA disputes the finding of concertedness. It asserts, for example,

---

**5.** The relevant portions of section 8, 29 U.S.C. § 158 (1988) read:

"(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .;
(4) to discourage or otherwise discriminate against an employee because [she] has filed charges or given testimony under this subchapter. . . ."

**6.** Ague was discharged for "'gross interference with the YMCA's enforcement of anti-harassment, and intimidating and demeaning employees who have filed sexual harassment charges.'" Rec., vol. III, doc. 1, at 24. The ALJ analyzed the unfair labor practice charge by focusing on Ague's phone call and using the four-part test.

Although we will follow this approach in assessing the sufficiency of the evidence, we note the existence of alternative ways to structure the analysis. In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S.Ct. 2469, 2472–73, 76 L.Ed.2d 667 (1983), for example, the Supreme Court stated that "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that [it] proffers are pretextual, the employer commits an unfair labor practice." A court therefore could avoid determining whether the phone call, standing by itself, was concerted activity and instead focus on the entire range of Ague's union activity and inquire whether the phone call was a mere pretext for the discharge. Because the ALJ found that the YMCA "seized upon this telephone conversation in order to rid itself of the leading union adherent; and that she would not have been discharged but for her union activities," rec., vol. III, doc. 1, at 27–28, and because our review of the record yields substantial evidence to sustain this finding, the ALJ's result could be upheld under the alternate analysis.

that no employee *specifically* asked Ague to telephone Duke, that Beal admitted his discharge was due to his sexual harassment of Duke, that Beal never stated he was certain his discharge was due to his union activities, and that it was Ague who suggested taking a complaint to the union. These contentions by the YMCA are either inaccurate or irrelevant. Our review of the record shows that while Beal emphasized he was *charged* with sexual harassment, he did not understand why he had been fired, and that perhaps it was a result of his support of Ague at the meeting with Klever. The fact that Ague suggested further investigation and consultation with the union is completely irrelevant. Concerted activity is activity "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee [herself]." *Meyers I*, 115 LRRM at 1029. Evidence that Ague received authority from Beal to pursue the matter on his behalf is sufficient to support a finding of "concertedness." [7] *See B & P Motor Express Inc. v. NLRB*, 413 F.2d 1021, 1023 (7th Cir.1969) (action in support of fellow employee over her grievance is concerted activity within meaning of section 7); *see also* rec., vol. III, doc. 4, at 2 (Board found that "Ague's telephone call to Duke was concerted activity engaged in with or on the authority of other employees, and not solely by and on behalf of the employee herself").

The YMCA then contends that the ALJ had insufficient evidence to support her finding that the YMCA knew Ague's telephone call to Duke was concerted activity protected under section 7.[8] We disagree. As the ALJ noted, Duke told Weber that Ague had referred to an "affidavit" she had to give. *See id.*, doc. 1, at 25. Additionally, Ague testified that she expressed her concern about Beal's discharge to Sanford prior to her telephone call to Duke. *See* rec., vol. I, at 121.

The YMCA's next contention is that Ague's telephone call caused harm as defined by Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. (1982), and created an intimidating and coercive environment for other employees in the exercise of their statutory rights. The call, according to the YMCA, therefore should lose the protection of the Act. In support of its argument, the YMCA engages in a lengthy discussion in which it emphasizes the potential liability it would face for any acts of retaliation against a sexually-harassed employee and for acts of sexual harassment of one of its employees by another. We agree with the ALJ that these arguments lack merit. Title VII makes it unlawful "for an *employer* to discriminate against any" employee who has complained of sexual harassment. 42 U.S.C. § 2000e–3(a) (1982) (emphasis added). Ague was neither the employer nor acting on her employer's behalf. Unlike *Arnold v. City of Seminole*, 614 F.Supp. 853, 859, 870 (E.D.Okl. 1985), which the YMCA cites, this case does not involve a city police chief threatening a plaintiff with discharge if she pursued her right to be free of sexual harassment. Here, by contrast, Ague was not in a position of authority over Duke, nor was she threatening her with discharge. This is also not a case in which the telephone call contributed to the hostile working environment envisioned by Title VII, since the regulations prohibit "verbal or physical conduct *of a sexual nature* ... [which] has the purpose or effect of ... creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a) (1989) (emphasis added). Ague's conduct is not consistent with that described by the regulations.

Finally, we must consider whether Ague's concerted activity should lose the protection of the Act because it was otherwise "unlawful, violent, in breach of contract or 'indefensible.'" *Coors Container*

---

7. The YMCA also asserts that Local No. 5, the union Ague contacted, was not the official collective bargaining representative and was less interested in Beal than in pursuing its own agenda. The union's status, of course, has no bearing on whether Ague herself was engaged in concerted activity, since section 7 protects employees who assist labor organizations or "engage in *other* concerted activities."

8. The YMCA does not contend that it lacked knowledge of Ague's union organizational effort.

*Co. v. NLRB*, 628 F.2d 1283, 1287 (10th Cir.1980), *citing NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962). We have reviewed the record, and we agree with the ALJ that Ague's conduct does not fall into any of these unprotected categories, nor does it "amount to egregious misbehavior that should rob this effort to assist fellow employee Beal of its protected character," rec., vol. III, doc. 4, at 3. Although Ague's call was somewhat imprudent and "lacking in sensitivity," *id.*, doc. 1, at 26, there is substantial evidence to conclude that Ague was simply attempting to ascertain whether Beal's discharge was union-related.[9]

The fourth and final factor we must consider is whether Ague's discharge was motivated by her protected activity. The YMCA does not dispute that Ague's telephone call to Duke to investigate Beal's discharge, determined to be a concerted, protected activity, was the basis for her discharge. This alone would be sufficient for a section 8(a)(1) and (3) violation. But even if the telephone call itself were not protected, we agree that the YMCA failed to prove by a preponderance of the evidence that Ague's discharge rested on her unprotected conduct, and not on her union activity. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399–403, 103 S.Ct. 2469, 2473–75, 76 L.Ed.2d 667 (1983);[10] *see also Head Division, AMF, Inc. v. NLRB*, 593 F.2d 972, 975 (10th Cir. 1979) ("the discharge of employees who are actively engaged in union affairs gives rise to an inference of impermissible, anti-union discrimination"). The YMCA failed to prove that the telephone call was anything but a pretext for Ague's discharge. Furthermore, we agree with the ALJ that because the YMCA generally required employees engaged in comparable conduct to undergo counseling but did not discharge them, the

> "disparity and severity of the discipline accorded Ague is indicia of unlawful motivation, and warrants an inference that [the YMCA] seized upon this telephone conversation in order to rid itself of the leading union adherent; and that she would not have been discharged but for her union activities."

Rec., vol. III, doc. 1, at 27–28 (citation omitted). The Board's determination that the YMCA violated sections 8(a)(1) and (3) by discharging Ague is therefore supported by substantial evidence.

The ALJ also found that the YMCA, by discharging Ague because she gave an affidavit to a Board agent, violated section 8(a)(4), which prohibits discrimination against an employee who gives testimony in an unfair labor practices investigation. The YMCA contends that this finding is not supported by substantial evidence because there was no proof it had knowledge of Ague's intention to give an affidavit, and because Ague was terminated solely for interfering with a sexual harassment investigation. As the ALJ noted, however, Duke told Weber of Ague's intention to give an affidavit, and the unfair labor prac-

---

**9.** We disagree with the dissent that this court's decisions in *Timpte Inc. v. NLRB*, 590 F.2d 871 (10th Cir.1979), and *Montgomery Ward & Co. v. NLRB*, 374 F.2d 606 (10th Cir.1967), require a different outcome. In *Timpte*, we emphasized that the employee's conduct was not impulsive but constituted a deliberate refusal to stop using filthy language in union campaign material after being requested to do so. *See* 590 F.2d at 873–74. In *Montgomery Ward*, the employee called a customer of the store a bastard and a son-of-a-bitch. *See* 374 F.2d at 611 n. 4. Here, Ague and Duke were co-employees, and while we do not condone Ague's conduct and believe whether it should be unprotected is a close question, we are not persuaded the Board erred in its determination.

**10.** The Supreme Court in *Transportation Management*, 462 U.S. at 402–03, 103 S.Ct. at 2474–75, approved of the Board's allocation of the burden of proof as set out in *Wright Line*, 251 NLRB 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). As characterized by the Court, *Wright Line* held that "the General Counsel carried the burden of persuading the Board that an antiunion animus contributed to the employer's decision to discharge an employee," but that the employer could assert an affirmative defense and "avoid the finding that it violated the statute by demonstrating by a preponderance of the evidence that the worker would have been fired even if [s]he had not been involved with the union." *Transportation Management*, 462 U.S. at 395, 103 S.Ct. at 2471.

tice charge concerning Beal's discharge was received by Weber's office prior to Ague's discharge. Since we have already held that the evidence supports a finding that Ague's investigation, a concerted and protected activity, motivated her termination, we conclude there is substantial evidence that the YMCA violated section 8(a)(4).

### D.

 The YMCA argues that its post-settlement conduct was unrelated to the pre-settlement conduct, and that this conduct therefore should not be used to set aside the agreement. In support of its position, the YMCA cites to *Deister Concentrator Co.*, 253 NLRB No. 40, 106 LRRM 1053, 1056 (1980), which held that rescission of a settlement agreement was unnecessary where the employer had substantially complied with the agreement and where post-settlement violations were essentially unrelated to the subject matter of the agreement. Here, by contrast, we have upheld the Board's conclusion that the YMCA effectively violated the agreement by retaliating against Ague for her activities on behalf of the union. *See* rec., vol. II, g.c. ex. 1(h), at 2 (settlement agreement). Moreover, the YMCA's pre- and post-settlement conduct were related since, as the ALJ observed, the prior conduct included threats of action against Ague, and the latter "involve[d] the implementation of those threats—her discharge." Rec., vol. III, doc. 1, at 24. Accordingly, we reject the YMCA's arguments and agree with the Board that the settlement agreement was properly set aside. We therefore turn to an assessment of the pre-settlement conduct.[11]

The YMCA objects to four findings of the ALJ concerning the pre-settlement conduct. It contends that the Weber/Ague

conversation did not constitute coercive interrogation; that Kirkland's comments to Ague were not coercive; that Klever's statements to Ague during the meeting were not coercive; and that the letter of reprimand to O'Bryan because of her discussion with Schwed did not violate sections 8(a)(1) and (3). We have reviewed the record as a whole with due regard for the ALJ's responsibility to judge the demeanor and credibility of the witnesses. We are persuaded there is substantial evidence to support the ALJ's findings.

We therefore grant enforcement of the Board's order.

BALDOCK, Circuit Judge, dissenting.

The court correctly holds that the YMCA was engaged sufficiently in interstate commerce to fall under the jurisdiction of the National Labor Relations Act, 29 U.S.C. § 160(a). I take issue, however, with the court's conclusion that the YMCA violated the Labor Act when it discharged Rita Ague for harassing Marnie Duke. Although substantial evidence supports the Board's determination that Ague's call constituted concerted activity, the rude and insensitive manner in which Ague conducted her investigation placed her conduct outside the protection of Section 7, 29 U.S.C. § 157.

### I.

Marnie Duke began working at the Garden Ranch YMCA in 1985 when she was fifteen years old. Rec. vol. I at 279–80. Duke's first exposure to Wes Beal's advances took place in September of that year:

I was cleaning in the lobby and he mentioned for me to come into the pool area. He had something to talk to me about. [H]e was sitting down in a chair and he pulled me over by my leg and he put his

---

**11.** The YMCA makes one additional argument that the six-month statute of limitations in section 10(b) of the Act, 29 U.S.C. § 160(b) (1988), bars reinstatement of the settled charge. That settled charge was timely filed, and we recognize the established doctrine that section 10(b) notwithstanding, the General Counsel may litigate matters embraced in a settlement agreement later validly set aside. *See Hotel & Restaurant Employees Local 19*, 281 NLRB No. 86, 124 LRRM 1110 (1986). If this doctrine were not valid, there would be little to prevent a party from breaching a settlement agreement with impunity once the six-month period had expired.

hands in between my legs and he start[ed] up my thigh quite a ways.

*Id.* at 281–81. In the following months, Beal repeatedly and without permission played with Duke's hair and rubbed her shoulders. *Id.* at 282–83. In January 1986, Duke was sitting next to the swimming pool with a towel over her lap. Beal sat down next to her, placed his hand underneath the towel and between her thighs. *Id.* at 284. Duke was frightened by the incident but declined to report Beal's behavior because she believed (incorrectly) that the YMCA managers were friends of Beal. *Id.* Thereafter, Beal continued to take liberties with Duke's person until March 1986 when she garnered the courage to report the harassment to Jim Klever, the regional president and chief executive officer. *Id.* at 288–89. Klever assured Duke that he would take care of the situation; Beal was discharged the following day. *Id.* at 290. Duke and her mother remained frightened that Beal would continue to harass her. Ray Weber, executive director of the Garden Center facility, assured Duke and her mother that the YMCA would do everything in its power to protect Duke from further harassment. *Id.* at 334, 390–91.

On the morning of March 18, Duke received a telephone call from Rita Ague requesting in a demeaning manner information on Beal's firing:[1]

[S]he told me that she had a few questions to ask about Wes's termination. And I told her that I did not have time to talk because I was going to school. She ignored that and she went on and she said that Wes does not know why the hell he was fired. She asked what I had said to get him fired, and I again just was ignoring. I was trying to get away from it. I was very nervous. I did not know what to say. She was an adult. I wasn't. I was taught to respect adults. I felt that it was none of her business at this point. She continued and once more

said Wes does not know why the hell he was fired. And I told her that I had to go to school. And she again—she said, 'I mean it wasn't as if he asked you to go to bed with him or anything.' Demeaning me, belittling me.

*Id.* at 295–96. Ague's call had an intimidating effect upon Duke: "I felt like this was never going to end. I had adults coming on to me and I was only 16 years old and they were just really coming on to me strong." *Id.* at 297–98.

Mrs. Duke was furious when she learned of Ague's conversation with her daughter. *Id.* at 338. She contacted Weber at the YMCA and told him that "we were not going to tolerate that [sic] kind of actions against our daughter." *Id.* at 338–39. Mrs. Duke demanded to know what the YMCA was going to do to protect her daughter from further harassment by Ague. *Id.* at 392. Weber discussed Ague's phone call with Diane Sanford, Ague's supervisor, expressing shock that a grown women would interfere in the private matter between Duke and the YMCA and would then press the matter once Duke stated repeatedly that she did not wish to talk to Ague. Weber told Sanford that the YMCA had a continuing duty to protect victims of sexual harassment. *Id.* at 456. Weber also discussed the situation with James Klever. Klever was appalled by Ague's conduct and expressed concern that the YMCA could be subject to liability for not taking action in response to Mrs. Duke's complaints. *Id.* at 525, 527–28.

The following day, Weber called Ague into his office and inquired about the telephone call. Ague stated that Duke did not understand what sexual harassment was, but did acknowledge making the telephone call and asking Duke specific questions concerning Beal. *Id.* at 396, 459. Later that day, Weber convened a second meeting with Ague whereupon he informed her that she was terminated for interfering

---

**1.** Although Ague's version of the conversation differs somewhat, her testimony confirmed Duke's in all important respects. Ague is not sure she used the term "why in the hell" suggesting instead that she said "why the devil." She also denies using a condescending tone. Rec. vol. I at 180. However, Ague acknowledged asking Duke "a string of questions: 'Did he touch you? Did he ... ask you to sleep with him? Did he say anything to you?'" *Id.*

with the YMCA's protection of sexual harassment victims. *Id.* at 402.

## II.

Section 7 of the Labor Act guarantees workers "the right to join or assist labor organizations, to bargain collectively through representative of their own choosing, and to engaged in other *concerted activities for the purpose of collective bargaining or other mutual aid or protection....*" 29 U.S.C. § 157 (emphasis supplied). "[I]n enacting § 7 ..., Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment." *NLRB v. City Disposal Systems,* 465 U.S. 822, 835, 104 S.Ct. 1505, 1513, 79 L.Ed.2d 839 (1984). Section 7 fundamentally seeks to protect workers' freedom of association in attaining improved wages and working conditions. *See* Fried, *Individual and Collective Rights in Work Relations: Reflections on the Current State of Labor Law and its Prospects,* 51 U.Chi.L.Rev. 1012, 1028–29 (1984). While Section 7 does not define "concerted activity," the term "clearly ... embraces the activities of employees who have joined together in order to achieve common goals." *City Disposal,* 465 U.S. at 830–31, 104 S.Ct. at 1511.

In determining whether an employee's action is "concerted," the touchstone inquiry is whether the action "reflect[s] actual group will in the workplace." *JMC Transp. v. NLRB,* 776 F.2d 612, 618 (6th Cir.1985). An individual acting alone engages in concerted activity when she acts on behalf of the workforce. *See City Disposal,* 465 U.S. at 831, 104 S.Ct. at 1511.[2] A conversation between an individual worker and her employer therefore may be concerted activity, so long as the conversation is related to group action in the interest of the employees. *NLRB v. Empire Gas,* 566 F.2d 681, 684 (10th Cir.1977) (following *Mushroom Transp. v. NLRB,* 330 F.2d 683, 685 (3d Cir.1964)). On the other hand, personal, albeit work-related, complaints by an individual employee do not constitute protected Section 7 activity. *City Disposal,* 465 U.S. at 833 n. 10, 104 S.Ct. at 1512 n. 10.

Action on behalf of an individual grievance also may constitute concerted activity. *See Intermountain Rural Elec. Ass'n v. NLRB,* 732 F.2d 754, 763 (10th Cir.) (employee argued with employer on behalf of fellow worker), *cert. denied,* 469 U.S. 932, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984). As Judge Learned Hand explained, the act of association, rather than the object of association, forms the basis of Section 7's protections:

> When all the other workmen in a shop make common cause with a fellow workman over his separate grievance ... they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts.

*NLRB v. Peter Cailler Kohler Swiss Chocolates,* 130 F.2d 503, 505 (2d Cir.1942) (L. Hand, J.).

"The fact that an activity is concerted ... does not necessarily mean that an employee can engage in the activity with impunity." *City Disposal,* 465 U.S. at 837, 104 S.Ct. at 1514. Section 7 does not protect concerted activity that is unlawful, violent, in breach of contract or otherwise indefensible. *NLRB v. Washington Alu-*

2. *See, e.g., Ewing v. NLRB,* 861 F.2d 353, 361 (2d Cir.1988); *Rockwell Int'l v. NLRB,* 814 F.2d 1530, 1534 (11th Cir.1987); *Dayton Typographic Serv. v. NLRB,* 778 F.2d 1188, 1191 (6th Cir. 1985); *JMC Transp.,* 776 F.2d at 618; *Dreis & Krump Mfg. v. NLRB,* 544 F.2d 320, 327–28 (7th Cir.1976); *Randolph Div, Ethan Allen Inc. v.*

*NLRB,* 513 F.2d 706, 708 (1st Cir.1975); *Owens–Corning Fiberglas v. NLRB,* 407 F.2d 1357, 1365 (4th Cir.1969); *see generally* Gorman & Finkin, *The Individual and the Requirement of "Concert" Under the National Labor Relations Act,* 130 U.Penn.L.Rev. 286 (1981).

*minum Co.,* 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962); *see also* R. Gorman, *Basic Text on Labor Law* 302–07 (1976). An employer therefore may discipline an employee for uttering defamatory or otherwise inappropriate statements, even when those statements constitute concerted activity. *See Old Dominion Branch No. 946, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 270–73, 94 S.Ct. 2770, 2774–76, 41 L.Ed.2d 745 (1974) (federal labor law does not pre-empt application of state libel law where statements uttered with knowledge of falsity or reckless disregard for the truth) (interpreting *Linn v. Plant Guard Workers of Am. Local 114,* 383 U.S. 53, 61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966)).[3] Neither do profane or otherwise intemperate expressions carry the protections of Section 7. *See Timpte Inc. v. NLRB,* 590 F.2d 871, 873 (10th Cir.1979) (circulation of letter disparaging employer in profane language).[4] But not every impropriety committed during concerted activity places the employee beyond the protective shield of Section 7. *NLRB v. Thor Power Tool Co.,* 351 F.2d 584, 587 (7th Cir.1965). "[L]abor disputes are ordinarily heated affairs, and ... confrontations between management and employees cannot be held to the standards of cool, analytical impartiality characteristic of the debating society." *Boaz Spinning Co. v. NLRB,* 395 F.2d 512, 514 (5th Cir. 1968). The employee's right to engage in concerted activity must permit some leeway for impulsive behavior. *Thor,* 351 F.2d at 587; *see Coors Container Co. v. NLRB,* 628 F.2d 1283, 1287 (10th Cir.1980) (vulgar language directed at security guard

improperly interrogating employee's "boycott Coors" sign protected).[5]

In determining whether Section 7 protects concerted statements, courts must examine the overall context in which the statement was uttered, *see NLRB v. New York Univ. Medical Center,* 702 F.2d 284, 290 (2d Cir.), *vacated on other grounds,* 464 U.S. 805–805, 104 S.Ct. 53–53, 78 L.Ed.2d 73 (1983), balancing the employees right to engage in concerted impulsive behavior against the right of the employer to maintain order and respect, *Thor,* 351 F.2d at 587. Where a worker's intemperate language is unrelated to any labor dispute, the concerted nature of those remarks does not invoke Section 7 protections. *Compare NLRB v. Local 1299, Int'l Bhd. of Elec. Workers,* 346 U.S. 464, 476–77, 74 S.Ct. 172, 178–79, 98 L.Ed. 195 (1953) (distribution of handbills attacking company not protected where handbills made no reference to labor dispute) *with Sierra Publishing Co. v. NLRB,* 889 F.2d 210, 215–16 (9th Cir.1989) (where letter by newspaper employees was directly related to labor dispute, distribution of letter to newspaper's advertisers protected). Disparaging remarks by union activists engaged in concerted activity therefore are entitled to less protection when directed against casual third parties than when addressed to management or non-striking employees. *Montgomery Ward & Co. v. NLRB,* 374 F.2d 606, 608 (10th Cir.1967) (picketing employee's epithets toward customer crossing picket line unprotected).[6]

### III.

In the instant case, Ague had at least some reason to conjecture that Beal had

---

**3.** *See, e.g., Bowling Green Mfg. v. NLRB,* 416 F.2d 371, 375–76 (6th Cir.1969) (defamatory statements in radio interview during organizing campaign); *Maryland Drydock Co. v. NLRB,* 183 F.2d 538, 539 (4th Cir.1950) (distribution of "scurrilous and defamatory literature" during organizing campaign); *NLRB v. Atlantic Towing Co.,* 180 F.2d 726, 726 (5th Cir.1950) (false accusation that employer committed unfair labor practice) (*per curiam*).

**4.** *See also Borman's Inc. v. NLRB,* 676 F.2d 1138, 1139 (6th Cir.1982) (employee wore T-shirt emblazoned with profane anti-employer slogan); *Boaz Spinning Co. v. NLRB,* 395 F.2d 512, 515

(5th Cir.1968) (employee called manager "Castro" in open plant meeting).

**5.** *See also NLRB v. Southwestern Bell,* 694 F.2d 974, 976–78 (5th Cir.1982) (expletive uttered by shop steward in heated argument with supervisor over allocation of overtime work); *Crown Central Petroleum v. NLRB,* 430 F.2d 724, 730–31 (5th Cir.1970) (coarse language in course of grievance committee meeting).

**6.** *See also Hotel Holiday Inn De Isla Verde v. NLRB,* 723 F.2d 169, 171 (1st Cir.1983) (disparaging remarks to hotel guests by picketing employees not protected).

been fired for his expression of union support. Although Ague's telephone call, at least in Duke's eyes, appears more officious intermeddling than union organizing, evidence in the record exists from which the Board reasonably could conclude that Ague was acting on Beal's behalf when she made the call. Accordingly, given our highly deferential standard of review, Ague's telephone call to Duke constituted concerted activity. *See City Disposal*, 465 U.S. at 829, 104 S.Ct. at 1510 (determination by Labor Board as to whether particular activity is concerted for purposes of Section 7 "implicates its expertise in labor relations.").

The court states that although Ague's telephone call was "somewhat imprudent and lacking in sensitivity," Ct. op. at 1452, it did not " 'amount to egregious misbehavior that should rob this effort to assist fellow employee Beal of its protected character[.]' " *Id.* (quoting rec. vol. III, doc. 4, at 3). The record reflects, however, that Marnie Duke suffered repeated humiliation at the hands of Wes Beal; only after much anguish did she garner the courage to report Beal's conduct to his superiors. Duke remained afraid of retaliation and relied upon assurances by the YMCA that she would be protected from further abuse. Viewing Ague's telephone call within the overall context of Duke's relationship with the YMCA, *see New York University*, 702 F.2d at 290, and considering the disparity in age between Ague and Duke, Ague's conversation falls within the category of expressions that this court held unprotected in *Timpte*, 590 F.2d at 873. Informing a sixteen year old victim of sexual harassment that "it wasn't as if he asked you to go to bed with him or anything," rec. vol. I at 296, after ignoring her repeated pleas to end the conversation is indefensible. For a stranger in this situation to subject a victim of sexual harassment to an explicit inquisition over precisely what formed the basis of her complaint when such information already had been provided to the YMCA and the victim clearly did not wish to discuss the matter is beyond acceptable discourse. *See Washington Aluminum*, 370 U.S. at 17, 82 S.Ct. at 1104. Ague's

insensitive attitude toward Duke is illustrated by her subsequent statement that Duke did not know what sexual harassment was. Rec. vol. I at 459. If Ague needed to know the details of Beal's harassment of Duke, such information could have been elicited through a formal grievance procedure or an NLRB hearing. Her telephone call therefore was not merely "imprudent," Ct. op. 1452; she addressed Duke "in such an abusive manner that [s]he los[t] the protection of § 7." *City Disposal*, 465 U.S. at 837, 104 S.Ct. at 1514.

By relying upon *Coors*, 628 F.2d at 1287, to support its holding that Ague's telephone call was protected activity, the court ignores the crucial distinction between concerted language directed against employers and such conduct directed toward innocent third parties. Although the rancor which often accompanies labor-management disputes precludes the application of parlor etiquette to concerted activity, in *Montgomery Ward* this court held that a much higher standard of decency is required where concerted statements are directed at parties not involved in the dispute. 374 F.2d at 608–09. In *Coors*, course language was uttered during an argument between employees and company officials; we held the employees' imprudent language to be an outburst subject to Section 7 protections. 628 F.2d at 1285–88. In contrast, Ague directed her derisive comments, not toward her employer, by rather toward a highly-reticent sixteen-year-old girl with no involvement in the unionization effort. Ague's comments were not impulsive statements uttered in the heat of a dispute; she "thought long and hard" before calling Duke. Rec. vol. I at 181. The court's reliance on *Coors* therefore is misplaced. This case is controlled instead by our holding in *Montgomery Ward* where we held that an epithet voiced by a picketing employee toward a customer crossing the picket line was unprotected concerted conduct. 374 F.2d at 608–09. Just as we held the picketing employee's conduct indefensible in *Montgomery Ward*, so should the court have held Ague's conduct unworthy of the protections of Section 7.

None of the policies underlying the relaxed standard for concerted statements are implicated in this case. Had Ague's remarks been uttered in the context of formal grievance procedure where frank exchange is necessary to the successful resolution of disputes, her concerted statements might be protected under Section 7. *See Crown Central Petroleum v. NLRB,* 430 F.2d 724, 730–34 (5th Cir.1970) (because unfettered exchange necessary in resolution of grievances, employees' intemperate remarks uttered during grievance committee meeting protected). However, Ague's abusive comments were made on her own initiative in a private telephone conversation with no adjudicative function. There is no reason why such statements uttered in this private context are entitled to any of the protections guaranteed by Section 7.

## III.

The court states that even if Ague's telephone call to Duke was unprotected conduct, the YMCA seized upon the call as a pretext to rid itself of a union activist. Ct. op. at 1452. I disagree. A preponderance of the evidence supports the view that the YMCA's discharge of Ague represented a legitimate effort to shield itself from Title VII liability from Marnie Duke and her parents. Even if the YMCA entertained some anti-union animus when it discharged Ague, the record shows that a well-grounded fear of Title VII exposure constituted an independent and legitimate basis for her discharge. As explained below, such fears were entirely reasonable given the current state of Title VII. *See NLRB v. Transportation Management Corp.,* 462 U.S. 393, 397, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1982) (where employer would have discharged employee for permissible reasons irrespective of union activity, improper motivation does not confer liability under the Labor Act).

A plaintiff may maintain an action for sexual harassment under Title VII, 43 U.S.C. § 2000e–2(a), by showing that her employer created a hostile working environment. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987). A hostile working environment exists when sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05 (quoting 29 C.F.R. § 1604.11(a)(3)). To prevail on a hostile environment theory, a plaintiff must prove that the harassment was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Hicks,* 833 F.2d at 1413 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Conduct need not be explicitly sexual to constitute sexual harassment under Title VII. *Hicks,* 833 F.2d at 1415.[7] Rather, "an actionable harassment claim must establish by the totality of the circumstances, the existence of a hostile or abusive *environment* which is severe enough to affect the psychological stability of a minority employee." *Vance v. Southern Bell,* 863 F.2d 1503, 1510 (11th Cir.1989) (emphasis in original). To determining whether an employer is liable for creating a hostile environment, we must "look to agency principles for guidance." *Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408; *Hicks,* 833 F.2d at 1417. "Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1486 (3d Cir.1990); *see Silver v. KCA, Inc.,* 586 F.2d 138, 142 (10th Cir. 1978).

In the instant case, Duke suffered repeated and uninvited sexual contact from YMCA employee Wes Beal. Once the YMCA learned of Beal's conduct, it had an

---

**7.** *See also Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3d Cir.1990); *McKinney v.* *Dole,* 765 F.2d 1129, 1138–39 (D.C.Cir.1985).

 

affirmative duty under Title VII to take prompt remedial action. Although Beal was promptly discharged, Ague's intrusive call inquiring into the intimate details of Duke's problems with Beal over Duke's repeated objections constituted further harassment. The court states that because Ague's conduct was not explicitly sexual in nature, it could not fall under Title VII. Ct. op. at 1451. This ignores our earlier holding in *Hicks* that explicitly sexual conduct is not necessary to effectuate a hostile working environment under Title VII. 833 F.2d at 1483. Demanding another detailed account of Beal's conduct in a belittling demeanor from a sixteen year old sexual harassment victim who did not wish to discuss the matter contributed to the hostile environment in which Duke was obliged to work. *See Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404–05. Duke was not able to distinguish between Beal's conduct and Ague's conduct; they were all part of the same pattern.[8] In determining whether the YMCA created a hostile working environment, a court therefore could look to the totality of the circumstances considering Ague's telephone call along with Beal's untoward conduct. *See Vance*, 863 F.2d at 1510.

The YMCA had actual knowledge both of Beal's harassment and Ague's intrusive telephone call. Indeed, following Ague's telephone call, the YMCA was faced with a demand by Duke's mother to protect her daughter from further harassment. Rec. vol. I at 338–39, 392. Had YMCA management not acted on these demands, the organization could have been exposed to Title VII liability on an agency theory. *See Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408; *Hicks*, 833 F.2d at 1417. Although the ALJ found that potential Title VII liability did not form the basis of the YMCA's decision to fire Ague, this finding was based

upon an erroneous understanding of the agency principles underlying Title VII. Accordingly, the ALJ's finding that Title VII exposure was not a component of the YMCA's decision to fire Ague was not entitled to deference by this court. *See Pullman Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

The dismissal of Rita Ague by the YMCA did not violate the National Labor Relations Act. I respectfully dissent.

---

8. The fact that in Duke's eyes the conduct of Ague and Beal were part of the same pattern is illustrated by Duke's comments to her mother after the phone call:

I told her that I was really tired of the whole situation. It was just continuing. And I told her that maybe it would have been best if I would have just quit at that time, before I had even said anything about Wes Beal. And then none of this would have happened ... She

told me that, yes, that would have been the easy way out, but we both decided mutually that, no. Wes Beal and Rita Ague were both harassing people. They were bothering us. They had no right to do that, and I stood up for not only me, but other people too that would further along get the same treatment I had.

Rec. vol. I at 305.